Clarissa S. THOMPSON et al., Plaintiffs,

v.

COUNTY SCHOOL BOARD OF ARLINGTON COUNTY, Virginia, et al., Defendants.

Civ. A. No. 1341.

United States District Court,
E. D. Virginia,
Alexandria Division.

Sept. 14, 1957.

568

Edwin C. Brown, Alexandria, Va., Spottswood W. Robinson, and Oliver W. Hill, Richmond, Va., for plaintiffs.

J. Lindsay Almond, Atty. Gen., James H. Simmonds and Frank L. Ball, Sr., Arlington, Va., for defendants.

ALBERT V. BRYAN, District Judge.

Seven Negro children of school age were refused admission as pupils in the public schools of Arlington County, Virginia on the opening day of the current session. The ground of the refusal was that the applicants had not complied with, or obeyed, the provisions of the Pupil Placement Act of Virginia, 1956 Acts, Extra Session, c. 70. That statute requires every child before entering a public school for the first time, or on graduation from one school to another, to apply to the Pupil Placement Board for enrollment. In refusing the admission, the school principals were following the directions of the defendant County School Board and Superintendent who, in turn, were following the Act. These children, now called the plaintiffs, assert that the refusal violates the injunction previously entered by this court restraining the defendants from denying enrollment in any public school of the County, on account of race or color, to any otherwise qualified child. The plaintiffs move for a supplemental decree directing the admission of these children to the schools. The court will grant the motion.

I. In its injunctive decree the court took notice of existing and future State and local rules and administrative remedies for the assignment of children to public schools. It directed conformance with them before the complainant should turn to the court. Of course, the decree only contemplated reasonable regulations and remedies. Defendants' position that the Pupil Placement Act is such a regulation or remedy is untenable. The procedure there prescribed is too sluggish and prolix to constitute a reasonable remedial process. On this point we also rely upon the reasoning of the Court of Appeals for this Circuit in School Board of the City of Newport News v. Atkins, 246 F.2d 325.

It must be remembered that we are viewing the Act in a different frame from the setting in which it was tested by the Court of Appeals. The Act was then appraised as an administrative remedy which had to be observed before the persons aggrieved could seek a decree of judicial relief. Now the Act is measured against the enforcement of a decree already granted. It is, too, a decree which was passed before the adoption of the Placement Act and bears the approval of the final courts of appeal. For these reasons decision here need not await the outcome of the pending effort to obtain a review of the Court of Appeals' judgment.

This court had hoped that the initial step provided in the Placement Act might be isolated and utilized as a fair and practicable administrative remedy. It thought that a requirement that a pupil first entering a school, or transferring from one school to another, should seek placement from some official or board, would not only be a reasonable, but a necessary regulation as well, in the administration of the school. This agency, it seemed, might validly be a State agency exclusively—such as the Placement Board.

However, the court finds that it cannot fairly require the plaintiffs even to sub-

mit their applications to the Board for school-assignment. The reason is that the form prescribed therefor commits the applicant to accept a school "which the Board deems most appropriate in accordance with the provisions" of the Pupil Placement Act. Submission to that Act amounts almost to assent to a racially segregated school. But even if the form be signed "under protest", the petitioner would not have an unfettered and free tribunal to act on his request. The Board still deliberates, on a racial question, under threat of loss of State money to the applicant's school if children of different races are taught there.

II. The court must overrule the claim of the County School Board and Superintendent that they should not be held to answer for the denial of admittance to the plaintiffs. In this they urge that the Placement Board had sole control of admissions—that the School Board and Superintendent had been divested by the Act of every power in this respect. As just explained, the Placement Act and the assignment powers of the Placement Board are not acceptable as regulations or remedies suspending direct obedience of the injunction. In law the defendants are charged with notice of these infirmities in the Board's authority. Actually the plaintiffs were denied admission by the defendants' agents—the school principals—while the defendants had the custody and administration of the schools in question.

Hence, the refusal by the defendants, immediately or through their agents, to admit the applicants cannot here be justified by reliance upon the Placement Board. The defendants were imputable, also, with knowledge that the injunction was binding on the Placement Board. The latter was the successor to a part of the School Board's prior duties; as a successor in office to the School Board, the Placement Board is one of those specifically restrained by the injunction.

III. We look, then, to see if race or color was the basis for the denial by the defendants and their agents of ad-

mission of the applicants to the named schools. It is immaterial that the defendants may not have intended to deny admission on account of race or color. The inquiry is purely objective. The result, not the intendment, of their acts is determinative.

In this inquiry we have no administrative decision with which to commence, save in one instance. Consequently, the court must examine the evidence in regard to each applicant and ascertain whether it indicates that the denial of admittance was there due solely to race or color. The court is not undertaking the task of assigning pupils to the schools. That is the function of the school authorities and the court has no inclination to assume that responsibility. Carson v. Warlick, 4 Cir., 1956, 238 F.2d 724, 728. But it is the obligation of the court to determine whether the rejection of any of the plaintiffs was solely for his race or color. In this light only does the court now review the evidence.

IV. Arlington is a small county in size, but thickly populated and having the appearance of a city. It has 22,677 (about) pupils in its public schools. Of these 1432 are Negroes—946 in the elementary schools, 311 in the junior high school (7th, 8th and 9th grades) and 175 in the senior high school (10th, 11th and 12th grades).

All together there are 40 school buildings in the County. These include 4 schools for Negroes—one high school, Hoffman-Boston (combining junior and senior) located in the extreme southern end of the County and embracing an elementary school with it; and 2 other elementary schools, Drew-Kemper near the Hoffman-Boston, and Langston in the district to be mentioned in a moment as the northern Hoffman-Boston.

There are 2 high schools for the white children, Washington and Lee in and to serve the northern half, and Wakefield in and for the south half, of Arlington; there are 6 junior high schools, Stratford and Swanson among them, scattered throughout the County for the white children; and there are 28 elementary

"white" schools, including Fillmore and Patrick Henry.

Each school and its contiguous territory form a school district. The boundaries of a district are drawn to include the school population in the vicinity of the school as far as the facilities of the school will allow. Before the creation of the Placement Board the pupils assignable to each school were, if otherwise eligible, limited to those who resided in the school district. These lines have never been altered by the School Board, but the defendants point out that the Placement Board may or may not follow these bounds. Apparently it has done so.

Nothing in the evidence indicates that any of the plaintiffs is not qualified in his studies to enter the school which he sought to enter. Each applicant applied to a "white" school, but each lives in the district of that school or of another nearby "white" school. Nor did the evidence reveal a lack of space for him, or that the school did not afford the courses suited to the applicant. Counsel for the defendants explained that they did not adduce evidence as to the eligibility of the applicants for their respective schools because this was a matter within the purview of the Placement Board. Anyway, no intimation of disqualification appeared as to any applicant.

A review of the evidence is convincing that the only ground, aside from the provisions of the Placement Act, for the rejection of the plaintiffs was that they were of the Negro race. The rejection was simply the adherence to the prior practice of segregation. No other hypothesis can be sustained in any of the seven instances. The evidence as to the plaintiffs shows as follows:

(1) Rita and Harolyn Johnson, 15 and 16 years old, personally presented themselves for admission to the Washington and Lee High School on the opening day, September 5, 1957. They desired to enter the 10th and 12th grades, respectively, and carried with them documentary evidence of their academic proficiency, having attended schools in the District of Columbia during the last school session.

Their residence is 2901 North Lexington Street, in the northern extremity of the County. It was within the Washington and Lee School District and a distance of approximately 2 miles (air line) from the school. The two other senior County high schools were twice that distance from the Johnson's.

They were refused admission because they had not executed the Board's placement forms. Their father declining to allow them to complete the forms, they are now attending school in the District of Columbia.

(2) Robert A. Elridge, aged 9, wished to enter the 4th grade. As a new arrival in the County, his father had made application on August 15, 1957, for the enrollment of Robert in Fillmore, an elementary school. He procured a placement form but did not file it. On the opening of school Robert was refused admission into Fillmore for lack of the form.

This boy lives at First and Fillmore Streets, a distance of slightly more than one city block from the Fillmore School, but is within the School District of Patrick Henry, an elementary school six city blocks away. A white child living there would normally enter either Patrick Henry or Fillmore. The nearest school used by colored children was 1.25 miles away.

(3) Leslie Hamm had completed the elementary courses at the County's Langston School and wanted to enter Stratford Junior High School. He was refused admission on the opening day of school at Stratford because he had not been assigned by the Placement Board, never having made application.

He resides at 1900 North Cameron Street. This address is within what we describe as the northern Hoffman-Boston District. This district, however, is 3.5 miles from the Hoffman-Boston School and from the area around that school also designated as a Hoffman-Boston District. The northern Hoffman-Boston District is set apart apparently because the area is occupied predominantly by Negroes. However, a white child living in the

northern District would be eligible to attend either the Swanson or Stratford Junior High School. Swanson is something more than a mile from the Hamm residence, Stratford slightly less than a mile.

(4) Louis George Turner and Melvin H. Turner, having respectively finished the 7th and 8th grades in one of the colored schools in the County, sought admission to the Swanson Junior High School on August 22, as well as on the opening day. Not having filled out the placement form, they were both refused admission. They live at the intersection of 22nd Street, North, and George Mason Drive. This is within the northern District of Hoffman-Boston. A white child in this section would ordinarily go either to Swanson or Williamsburg Junior High School. Swanson is less than a mile distant, while Williamsburg is about 1.25 miles away.

(5) George T. Nelson filled out a placement form and filed it on August 19 or 26 with the principal of Stratford Junior High School. On this application, the Pupil Placement Board assigned him to Hoffman-Boston School. On the opening day of school he was refused admission at Stratford.

Nelson lives at 2005 North Cameron Street. This is within the northern Hoffman-Boston District. Hoffman-Boston School is 6 miles from his home, while Stratford is ½ mile away. Swanson Junior High School is a little further away. The basis for the Board's placement is not given; no reason is evident for ignoring Stratford or Swanson. It cannot be accepted, for it is utterly without evidence to support it.

■ V. The defendants and their agents, in barring the admission of the complainants, did not intend any defiance of the injunction. The bona fides of their assurance to the court—that they believed they should not admit the applicants without an assignment by the Placement Board—cannot be doubted. However, the defendants and their agents must now understand that the injunction is paramount in the present circumstances and that they can no longer refuse admittance to the plaintiffs.

The injunction will affect the school attendance very slightly. Into a white school-population of 21,245, only 7 negro children will enter; 1 negro will be with 11,421 white children in the elementary grades; and no more than 6 negroes among the 9,824 white high school students. Of 36 previously "all-white" schools in the County, 4 will be affected by the decree, and then not to a greater extent than 2 negroes in any one of the 4 schools.

The supplemental decree will be effective at the opening of the schools Monday morning, September 23, 1957.