Clarissa S. THOMPSON et al.
v.
COUNTY SCHOOL BOARD OF ARLINGTON COUNTY, Virginia, et al.
Civ. A. 1341.

United States District Court
E. D. Virginia,
Alexandria Division.
Sept. 17, 1958.

10. See Coine v. Smith, supra, and Patterson v. Cargo Services, supra.

11. Coine v. Smith, supra; Patterson v. Cargo Services, supra.

12. LSA–R.S. 22:658.

See, also, 159 F.Supp. 567.

Oliver W. Hill and Spottswood W. Robinson, III, Richmond, Va., Frank D. Reeves, Washington, D. C., and Otto L. Tucker, Alexandria, Va., for plaintiff.

Albertis S. Harrison, Jr., Atty. Gen., of Virginia, Henry T. Wickham, Special Asst. to the Atty. Gen., of Virginia, James H. Simmons of Arlington County, and Frank L. Ball, Arlington County, Arlington, Va., for defendant.

ALBERT V. BRYAN, District Judge.

Now, for the first time, this case comes before the court upon an assignment of pupils made by State and local authorities and founded on local conditions. Decision is reduced to an administrative review. The case signally demonstrates the soundness and workability of these propositions: (1) that the Federal requirement of avoiding racial exclusiveness in the public schools—loosely termed the requirement of integration—can be fulfilled reasonably and with justice if the guide adopted is the circumstances of each child, individually and relatively; (2) that it may be achieved through the pursuit of any method wherein the regulatory body can, and does, act after a fair hearing and upon evidence; and (3) that when a conclusion is so reached in good faith, without influence of race, though it be erroneous, the assignment is no longer a concern of the United States courts.

In this court's 1956 opinion, 144 F. Supp. 239, referring to the right of the pupils to seek enforcement of the injunction, these same propositions were suggested. But in 1957 no ground whatsoever was tendered for such considerations. The opinion then commented, " * * * we have no administrative decision with which to commence, save in one instance". 159 F.Supp. 567, 569. Now the premises are offered.

Weighing these, the court cannot say that as to twenty-six of the thirty pupil-plaintiffs their applications for transfer to "white" schools were refused without substantial supporting evidence. As to the remaining four, refusal of their applications for transfer is not justified in the evidence. They are Ronald Deskins, Michael Gerard Jones, Lance Dwight Newman and Gloria Delores Thompson.

These four are all applicants for Stratford Junior High School; they have asked to enter the seventh grade, the first year of junior high. Before this decision can be effectuated by a final decree, ten days or more would routinely elapse, carrying the effective date into October.

In the judgment of the court it would be unwise to make the transfers as late as that in the term. The decree, therefore, will be made effective at the commencement of the next semester, January, 1959. This short deferment will not be hurtful. Indeed, if the basic problem can be solved by time, the price is not too dear.

I. The evidence upon which the assignments were made was taken subject to several motions and these should be passed upon before the evidence is considered. Counsel for the Pupil Placement Board, appearing in association with the attorneys for the defendants, has moved the court to dismiss the entire proceeding on the ground that his client is an indispensable party to an action of this kind and has never been brought into the case. He relies on the Pupil Placement Act of Virginia, 1958 Acts of the General Assembly, c. 500, 1950 Code of Virginia, as amended, 22–232.1, supplementing the 1956 Pupil Placement Act. This legislation purportedly vests in the Pupil Placement Board, exclusively, all authority to determine the school to which any child shall be admitted. It is argued that as the present action involves the admission of the plaintiff-pupils into the schools, the Board should be a party. The motion must be denied.

While the Pupil Placement Act has been amended, since the 1957 holding of this court that the procedure there stipulated was not an adequate administrative remedy, it is still not expeditious. The student would be too far delayed into the session before his application would be finally determined. Then, at the end, the school closing and fund-cut-off statutes automatically shut the school, and withhold any money for its operation, should the student be assigned to a school then teaching children of the other race. Acts of the General Assembly of Virginia, 1956, Ex.Session c. 68, 1950 Va.Code, as amended, 22–188.5; Acts 1958, c. 642, Item 129 (Appropriations for schools).

It may be, however, that the first stage prescribed in the Act is adoptable—some State or local authority must process the

applications and make the assignments—but the point is moot. The applications in suit were considered by the Placement Board and the Arlington County School Board together. The results, the refusals to grant the transfers, were in effect assignments. There is no reason to decide now whether this was Placement Board or School Board action.

Nevertheless, in no event need the Placement Board be impleaded here. The impact of any decree would be upon the persons immediately in charge of the schools. They it is who actually admit or reject the students. Ordinarily they would be the employees of the School Board, such as the principals and the teachers. From the fact that the School Board and its employees may be controlled in their acceptance of students by the Pupil Placement Board, it does not follow that the court cannot judge of the validity of such regulations without having the Placement Board before it.

■ The plaintiffs move to strike from the evidence the findings of the Director of Psychological Services of the Virginia State Department of Mental Hygiene in regard to the psychological problems of certain of the applicants. It is conceded that the School Board or the Placement Board had the right to consider this report. The objection is that in trial it is hearsay, because the Director was not called as a witness. So, far the motion is good. However, it does not preclude the court from considering the report in measuring the evidence that was before the Boards.

■ II. By the assignments of the Boards, thirty Arlington County Negro pupils have been refused transfer from the previously all-Negro schools to several previously all-white schools. The assignments were the result of a screening of the pupils against criteria of five categories designated as: Attendance Area, Over-crowding at Washington and Lee High School, Academic Accomplishment, Psychological Problems, and Adaptability. Five of the thirty are the children who were ordered admitted by this court in September 1957, but the order was stayed pending appeals. Contrary to their argument, however, these pupils have not by virtue of that order a vested position for this session. Admissions must be judged on current conditions, the rule to be applied to all students. In this discussion the children will be designated according to the letters and numbers used in the trial.

A: Attendance Area—Pupils 2, 3, 4, 9, 14, 15, 17, 18, 23, 24 and 25

On the Attendance Area test eleven transfers were declined—students Nos. 2, 3, 4, 9, 14, 15, 17, 18, 23, 24 and 25. With the slight exceptions hereinafter noted, the school districts have remained the same since the lines were fixed long prior to the Supreme Court's decision of May 17, 1954. These pupils have been attending the Hoffman-Boston School. It has been housing elementary grades, as well as both junior and senior high schools, but solely for Negroes. The Hoffman-Boston lines were originally drawn to embrace an area occupied almost entirely by Negroes. In fact, save for a very small area known as the north Hoffman-Boston district, it is the only Negro residential section in the County. These eleven pupils (2, 3, 15 and 25 being senior high school students and 4, 9, 14, 17, 18, 23 and 24 junior high school students) live in the Hoffman-Boston area.

There is no other high school, white or colored, nearer to them than Hoffman-Boston. Nos. 2, 3, 15 and 25 applied for admission to Wakefield High School. Among other adjustments this change would mean the establishment of a new bus route and would mean a longer haul than the bus ride now afforded them to Hoffman-Boston.

The others sought entry into either Kenmore Junior High School, Gunston or Thomas Jefferson. In distance all of these schools are slightly closer to their residences than Hoffman-Boston. However, the school authorities had other factors to consider, such as the adoption of presently established school bus routes,

walking distances and the crossing of highways, as well as that Hoffman-Boston was but a twenty-minute bus ride for these pupils.

### B: Academic Accomplishment Deficiency of These and Also B, C, D, E, 5, 6, 8, 10, 11, 12, 21 and 22

Excepting No. 18, all of the immediately considered pupils—2, 3, 4, 9, 14, 15, 17, 23, 24 and 25—were also refused transfer because of their academic standing. Besides these, pupils B, C, D, E, 5, 6, 8, 10, 11, 12, 21 and 22 were likewise found to be ineligible, on account of academic deficiency, for the transfers requested.

In making the academic determinations the California Achievement Test was the principal factor. Other factors were the school records and experience. While among these twenty-two pupils some were listed on their student report cards as making low scholastic averages, just about as many had high averages and others were "on grade level". Their intelligence quotients are not low. The school authorities do not deny these evaluations. But they emphasize that these standings are related only to the then grade and school of the children. The basis for refusal of the transfers was not those standings. The basis was that the scholastic standing in the classes to which they asked entry was above the individual standings of the applicants to the extent that the transfers could not be justified under sound educational principles.

The median achievement level in the schools to which entrance is sought, the evidence shows, is appreciably higher than the national norm. On the other hand, the median of the schools from which the applicants would come, is more than a year below this norm. Moreover, in the schools applied for, two-thirds of the pupils have achievement ratings above the national norm; while in the schools of origin, four-fifths of the students are well below the national norm. So a transfer might result in placing the pupil in an achievement group one or more years above the achievement category of his present group.

With the exception of pupil 18, all of the applicants now in discussion—2, 3, 4, 9, 14, 15, 17, 23, 24, 25, B, C, D, E, 5, 6, 8, 10, 11, 12, 21 and 22, totaling twenty-two—were below the median achievement of the ad-schools. Fifteen—22, 11, 14, 24, E, C, 10, 5, 8, 25, 15, D, 21, 12, 3 —of them were below the national norm. Two of them were three years below and five others as much as a year or more. It must be remembered, though, that some of the ad-school students are also below the national norm. In the table of average mental maturity, grade for grade, the Hoffman-Boston is shown to be more than fifteen points under the other schools, the one about 90 and the other 105 plus.

### C: Psychological Problems—Pupils C, 1, 2, 6, 8, 21 and 24

Seven applications were declined because of psychological problems. Of these seven, six—C, 2, 6, 8, 21 and 24—were among those just noted as rejected for academic deficiency. No. 1 was not in that group. For this classification the Boards chiefly relied upon the conclusions of the State Director of Psychological Services. Of course, the school records of these children were also at hand. In substance, the opinion of the Director was that "it would be unwise and possibly harmful to this child to subject him to the pressures which might result from attending a school" having children of a different or another race. Instability, lack of self-control, extreme shyness and difficulty of mingling or making friends are the circumstances generally named by him for his conclusions, persuading him that entry into such a school would result in severe difficulty in the schools as well as to the subject pupil. Thus the Director's determinations do involve race.

### D: Overcrowding at Washington and Lee—Pupils D, 1, 12, 19 and 21

For senior high school attendance allocations, Arlington County has been for many years divided into three districts.

The Washington and Lee District, taking the name from the high school located in the north center of the County, originally embraced approximately the north half of the county. The second district is Wakefield, named for another high school situated on the extreme western boundary of the county and in the southwest section. The third district is Hoffman-Boston, already described, and forming an enclave within the Wakefield District.

Before the commencement of this litigation and without anticipation of it, a large area in the northwest corner of the County was taken out of the Washington and Lee District, because of the over-population of that high school. The severed area is not contiguous to but well north of the line between the Washington-Lee and the Wakefield districts. Since the inception of the present controversy the northern district of Hoffman-Boston has been vacated. It was entirely surrounded by Washington-Lee District; hence it is now thrown into that district. This small territory is contiguous to that part of Washington and Lee just described as taken off from the latter. Pupils D, 1, 12, 19 and 21 reside within the territory formerly comprising the northern district of Hoffman-Boston. They have been assigned to the Hoffman-Boston High School.

Washington and Lee High School is much nearer to their residences than is Hoffman-Boston. Indeed, it lies between the residences and Hoffman-Boston, away from the residences about one-fourth of the total distance. Overcrowding of Washington and Lee is the basis for the assignment of these pupils to Hoffman-Boston.

Before the necessity arose for considering the assignment of senior high school pupils residing in the former northern Hoffman-Boston District to any high school other than Hoffman-Boston, the Washington and Lee High School had become congested. The present population is 2,600 as against a maximum capacity of 2,000. At Hoffman-Boston, the current population is 575, with a capacity of 375, augmented now by four tempo-rary classrooms accommodating 100 more pupils and to be increased, further, by the addition of five classrooms now under construction, for completion in January 1959, to care for 125 pupils. The total facilities at Hoffman-Boston will thus be 600. Wakefield is constructed for 2,000 but presently has 2,540 students.

In maintaining the assignment of these students to Hoffman-Boston, rather than to Washington-Lee, the defendants referred to corresponding treatment of Caucasian pupils. They point to the students living in the territory severed from Washington-Lee. These white pupils in the tenth grade (the first year of the senior high school) must go to Wakefield High School. This is a distance as great, if not greater, than the trip to Hoffman-Boston from its former northern district. They note still another comparable transportation of white students. Those living at Fort Myer, in the southeast part of the county, are not permitted to go to the nearer Washington-Lee High School but are required to attend Wakefield, on the other side of the county. The Hoffman-Boston School is superior to any of the other schools in the county in its 18.5 pupil-teacher ratio.

### E: Adaptability—Pupils A, 7, 13, 16 and 20

Thus, eighteen of the thirty applicants have been found disqualified upon at least two, and sometimes three, of the criteria, and seven for the sole reason of overcrowding, attendance area, or academic standing. The remaining five applicants —A, 7, 13, 16 and 20—were refused transfer for failing the test of Adaptability.

On this last criterion the principal witness was the Superintendent of Schools. With thirty-two years in segregated schools, his experience covers both Negroes and Caucasians, though separately. He defines Adaptability as including the ability to accept or conform to new and different education environment. In reference to these five pupils he readily concedes that their places of residence would entitle them to go to the schools of

their application—Pupil A to Patrick Henry Elementary School, and 7, 13, 16 and 20 to Stratford Junior High School.

But the point made by the Superintendent is that these students would, respectively, be injured by placement in Patrick Henry or in Stratford Junior High School. His reason is that they would lose their present position of school superiority and leadership. At Hoffman-Boston 7, 13, 16 and 20 rate about two years above the school norm of achievement. They are nearly a year ahead of the national norm. However, if they enter Stratford, they will not, as they are in Hoffman-Boston, be in the top group, but just above the achievement median of that school. They will not be among the leaders. Analogous reasoning is applied to A at Patrick Henry. The Superintendent feels that this would be discouraging and possibly emotionally disturbing to them. Race or color is not the basis for his opinion, though, he owns, the necessity for his decision is occasioned by the removal of racial bars.

### Conclusion

1. The very formulation and use of the criteria is pleaded by the plaintiffs as racial discrimination. With this the court disagrees. True, previously no such tests were known; they came into being in the latter part of August 1958 in connection with the instant school assignments. But this does not prove discrimination.

These tests were not used previously because there was no necessity. The removal of the rule and custom of segregation was an abrupt change. It was a social epoch, beginning a new era. Accommodation to its demands meant new methods as well as facilities. The assignment of pupils took on an added obligation. At some time and place, assignment regulations had to be adopted. Therefore, the instant criteria are not discriminatory as born of a social change. Otherwise, after the erasure of race as a factor in pupil placement, no assignment plan could ever be validly adopted.

2. This recital of the evidence is not written with the implication that the evidence as to the tests was not questioned. In refutation the plaintiffs offered evidence of considerable weight and relevance. But the court does not in a case of this kind resolve such differences. It examines the conflicting evidence only to see if the rebuttal evidence destroys any weight that might be given to the defendants' proof. Its inquiry is to ascertain if the defendants' evidence, independently of influence of race or color, was sufficient to sustain the action of the Placement Board and the School Board.

3. The reasons given for disqualifying the seven students upon the test of the Psychological Problems obviously give consideration to race and color. On the other hand, the rejection was not due solely to these features. The court, however, does not rule on the weight to be accorded this test because the evidence before it upon the point is too scant. The psychologist was not called as a witness and the court does not have the benefit of his exposition. Therefore, this test must be disregarded for this case.

4. Plaintiffs urge that invalidity of the assignments is conclusively established by the result, that is, that all Negro pupils remain in the Hoffman-Boston School. Though plausible, the argument is not sound. Actually, the principal reason for the result is the geographical location of the residences of the plaintiffs, indeed of the entire Negro population in Arlington County. It is confined to two sections, the Hoffman-Boston area and the previous, small northern division of the Hoffman-Boston, several miles apart. Hoffman-Boston is by far the larger Negro area. This situation seemingly would be frequently found in areas, like Arlington County, urban in character.

It occurs, too, from the relatively small Negro population in the County. The condition now does not differ greatly from that noted in this court's opinion of September 1957. Then there were 1432 Negroes in all of the County's schools. This compared to some 21,000 white stu-

dents. The latter are scattered throughout the County. The concentration of Negro population is confirmed in this case by the fact that only one white-school parent was available to testify as a resident of Hoffman-Boston district.

■ Nor is discrimination proved by the stipulation that 100 Negro pupils are transported to Hoffman-Boston from the now dissolved northern division of Hoffman-Boston. As many as 250 white pupils are carried from the severed portion of Washington-Lee District to Wakefield. Only eighteen of these Negroes are complainants here. They are D, 1, 12, 19, 21, B, C, E, 5, 6, 7, 8, 10, 11, 13, 16, 20 and 22. Without ignoring the record and without presuming bad faith in the Boards, it cannot be said that they were sent to Hoffman-Boston simply to segregate the Negro children. For example, D, 1, 12, 19 and 21 were sent specifically because of the overcrowding at Washington and Lee. Either these or some other pupils, white or colored, had to be rejected at Washington-Lee. It was not illogical to turn away those who had more recently become eligible, in favor of those who were already in, or had studied for entrance into, Washington and Lee. Again, proof that the assignments to the Hoffman-Boston School were not arbitrary is seen in the specific finding in respect to B, C, D, E, 5, 6, 8, 10, 11, 12, 19, 20, 21 and 22—want of academic accomplishment.

5. The court is of the opinion that Attendance Area, Overcrowding at Washington and Lee, and Academic Accomplishment clearly are valid criteria, free of taint of race or color. It concludes also that these criteria have been applied without any such bias. It cannot say that the refusal of transfers on these grounds is not supported by adequate evidence.

The court may have made a different decision on this evidence; it may not agree with the conclusions of the Boards. But that is of no consequence once it is found that the administrative action is not arbitrary, capricious or illegal. Thus the denial of twenty-five of the applications must now be sustained.

■ 6. The remaining five applications—A, 7, 13, 16 and 20—failed on the test of Adaptability. This is the most difficult criterion to evaluate. It is certainly not frivolous, especially when it is the opinion of an educator of thirty-two years experience. In certain circumstances, undoubtedly, the line of demarcation between it and racial discrimination can be so clearly drawn, that it can be the foundation for witholding a transfer. Pupil A exemplifies this hypothesis.

Ten or eleven years old, with an academic achievement "on a grade level", this boy wishes to transfer from Hoffman-Boston Elementary School to Patrick Henry, also elementary. The latter is nearer his residence than is Hoffman-Boston. But he leaves a school with lowest of all pupil-teacher ratio. His only advantage is one of distance; in good weather and subject to pedestrian traffic dangers, he could walk to Patrick Henry, about a half mile away, while the school bus would take him to Hoffman-Boston, 1.2 miles off, in perhaps less than his walking time.

The median of academic achievement for his grade at Hoffman-Boston is 3.9. As he is "on grade level" this would indicate his standing. In Patrick Henry the same median is 6.0. The average mental maturity for the fifth grade in Hoffman-Boston is 87, while in Patrick Henry it is 113, a difference of twenty-six. Laying aside the physical circumstances, the court cannot say that Adaptability, in view of the intelligence factors, is a capricious standard when applied to A. His transition could well be discouraging, if not disparaging, one from which a student may be lawfully saved by the judgment of the more experienced.

The circumstances of 7, 13, 16 and 20 are different from A's. They live in the former northern district of Hoffman-Boston; their homes are near Stratford Junior High School and within its region. Each of them stands above the median

achievement score of Stratford. They have a common age of twelve years and they all would enter the first year of junior high school. They are a group formerly attending Langston Elementary School together, presumably friends having common interests.

In these circumstances, having in mind also their relative academic standing, Adaptability could hardly bar them. The court finds no ground in the record to uphold the Boards' refusal of the transfers of 7, 13, 16 and 20—Ronald Deskins, Michael Gerard Jones, Lance Dwight Newman and Gloria Delores Thompson.

### Colophon

The length and detail of this statement were necessary to assure care and solicitude for the actions of State and local administrative agencies. It is an effort, too, to establish for cases of this character some design for decision.