Earnestine DOVE, A Minor, by her Father and Next Friend, William Dove, James Edwards Warfield, A Minor, by his Father and Next Friend, New James Warfield, and Corliss Smith, A Minor, by her Mother and Next Friend, (Mrs.) Sarah Smith, Plaintiffs,

v.

Lee PARHAM, Joe Pierce, Robert Bryant, Carl Purnell, and Orville Phillips, Respectively President, Secretary and Members of the Board of Directors, Dollarway School District Number 2, Dollarway School District Number 2, A Corporation, and Charles L. Fallis, Superintendent of Public Schools of said District, Defendants.

No. 3680.

United States District Court
E. D. Arkansas, W. D.

Feb. 19, 1960.

George Howard, Jr., Pine Bluff, Ark., Robert Carter, New York City, for plaintiffs.

Herschel H. Friday, Jr., Robert V. Light, Little Rock, Ark., for defendants.

HENLEY, Chief Judge.

This public school desegregation case is now before the Court on the supplemental complaint of the plaintiffs, which complaint has been heard on its merits, subject to the motion of the defendants to dismiss, or, in the alternative, for a stay of proceedings.

The plaintiffs, Negro children of school age residing within Dollarway School District No. 2, Jefferson County, Arkan-

sas, commenced this suit originally as a class action to put an end to racial segregation in the public schools of the district, and to obtain an adjudication that the Arkansas pupil placement laws of 1956 and 1959 [1] are unconstitutional as violative of the 14th Amendment to the Constitution of the United States as construed by the Supreme Court of the United States in the Brown cases. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

In resisting the plaintiffs' original claim for relief, the defendants, the members of the board of directors of the Dollarway School District, and the Superintendent of Schools of said District, took the position that the statutes above mentioned were constitutional, that plaintiffs had not exhausted their administrative remedies under said statutes, and for that reason had no standing in this Court. While the defendants conceded that prior to the Brown decisions the public schools in the Dollarway District had been operated on a racially segregated basis, and while they conceded further that they had adopted no affirmative plan for integration of the schools, either at once or over a period of time, they asserted that they recognized the force of Brown and that they proposed to administer the assignment statutes in a racially nondiscriminatory manner.

On July 31, 1959, following a trial, this Court held that, while the Arkansas statutes were constitutional, the defendants were employing the pupil assignment laws so as to perpetuate segregation in the public schools, that recourse by the plaintiffs to the administrative procedures provided by the statutes would be futile, and that the plaintiffs should be admitted to the all-white Dollarway School at the commencement of the 1959–60 school year.[2] Dove v. Parham, D.C.Ark., 176 F.Supp. 242.

Both sides appealed from the rulings of the trial court. Due to the importance of the litigation and to the imminence of the 1959–60 school term, the Court of Appeals advanced the case and heard oral argument on September 21, 1959. The arguments having been concluded, the Court announced from the bench that it was affirming the decision of the District Court to the extent that said decision upheld the facial constitutionality of the Arkansas assignment statutes, but that it was reversing that part of the judgment which held that the plaintiffs were entitled to admission to the Dollarway School without exhausting the administrative remedies provided by said statutes, and particularly by Act 461 of 1959.[3] The Court directed that its mandate issue forthwith, but reserved the right to file a formal opinion, and on October 8, 1959, it filed such an opinion setting forth its views. Parham v. Dove, 8 Cir., 271 F.2d 132. It is hardly necessary to say that this opinion of the Court of Appeals established the law of the case and is binding upon this Court at this time.

The mandate of the Court of Appeals, which was filed in this Court on September 23, 1959, provided, among other things, that an injunction should be issued restraining the defendants "from continuing to maintain the system of unconstitutional segregation, which has heretofore existed in Dollarway School District No. 2." It was provided further that the case should remain open upon the docket "to permit the filing of such supplemental complaint, if any, as might be entitled to be presented to the

---

1. Initiated Act No. 2 of 1956, Ark.Stats. § 80–1519 et seq. and Act 461 of 1959. Act No. 2 was in force when the suit was filed in February 1959, and Act 461 was in force in the summer of that year when the case originally was tried.

2. There are only two public schools within the Dollarway District, in both of which all twelve grades are taught.

The Dollarway School traditionally has been the school wherein white students were educated, and the Townsend Park School has been devoted to the education of Negro students.

3. Act 461 of 1959 repealed the 1956 statute, and no further mention of the earlier enactment will be made.

Court, in case of an unconstitutional application of the provisions of the Pupil Assignment Act of 1959 against the plaintiffs, or of other unconstitutional action on the part of the School District in relation to them." [4]

Act 461 of 1959 provides for the assignment by local school boards of particular students to particular schools in accordance with criteria prescribed by the Act.[5] A procedure is provided whereby a student dissatisfied with his assignment may obtain a hearing before the board. The Act provides for an appeal from final board action to the circuit court of the county in which the school district involved is located and for appeal from the circuit court to the Supreme Court of Arkansas.

On August 17, 1959, the Board formally adopted regulations which included a procedure for handling applications for transfer and which adopted the criteria set forth in the statute. The regulations provided, however, that the matters considered by the Board in making assignment and transfer determinations were not necessarily limited to the statutory criteria.

Soon after the decision of the Court of Appeals, the plaintiffs, all of whom initially had been assigned to the Townsend Park School for the 1959–60 school year, applied to the Board for transfers to the Dollarway School. At the direction of the Board the plaintiffs submitted to physical examinations, were given intelligence tests, and were interviewed by a psychiatrist and an educational psychologist engaged by the Board. Thereafter, on October 8, 1959 (the same day, incidentally, that the written opinion of the Court of Appeals was filed), the Board held a hearing on plaintiffs' applications. In due course the Board made findings to the effect that when the assignment criteria provided by the statute and by the Board's regulations were applied to the respective plaintiffs, all of the requested transfers should be denied. The plaintiffs filed exceptions to the Board's determinations, as provided by the statute, which exceptions were overruled. The overruling of the exceptions consti-

4. As pointed out above, the mandate provided for the issuance of an injunction. However, no request was made to this Court to issue such an order nor was any precedent for such presented to the Court. The Court brought the matter up on its own motion at the pre-trial conference held subsequent to the filing of the supplemental complaint. At that time and later, during the course of the hearing on the merits of the supplemental complaint, counsel for the defendants stated that although no injunction actually had been issued, the defendants considered that the opinion of the Court of Appeals itself amounted to an injunction, and that they considered themselves under injunction in the terms of the language of the opinion of that Court, which language is essentially the same as that of the mandate. After the hearing on the merits, counsel for the plaintiffs presented a precedent for an injunction, but in view of the advanced stage of the proceedings it was considered better to enter no order until the present contentions of the parties are finally determined.

5. Those criteria are: available room and teaching capacity in the various schools; availability of transportation facilities; the effect of the admission of new pupils upon established or proposed curricula for particular pupils; the adequacy of the pupil's academic preparation for admission to a particular school and curriculum; the scholastic aptitude and relative intelligence or mental energy or ability of the pupil; the psychological qualification of the pupil for the type of teaching and associations involved; the effect of admission of the pupil upon the academic progress of other students in a particular school or facility thereof; the effect of admission upon prevailing academic standards at a particular school; the psychological effect upon the pupil of attendance at a particular school; the possibility of breaches of the peace or ill will or economic retaliation within the community; the home environment of the pupil; the maintenance or severance of established social and psychological relationships with other pupils and with teachers; the choice and interests of the pupil; the morals, conduct, health and personal standards of the pupil; the request or consent of parents or guardians and the reasons assigned therefor; and other relevant matters. Act 461 of 1959, Section 4.

tuted final Board action on plaintiffs' applications for transfer, and it was open to plaintiffs to appeal to the Circuit Court of Jefferson County, Arkansas. Instead of doing that, however, the plaintiffs filed their supplemental complaint in this Court alleging that the actions of the Board in denying their respective transfer requests were based on racial grounds and amounted to an unconstitutional application of the 1959 pupil assignment law.

The defendants moved to dismiss the supplemental complaint, or, in the alternative, for a stay of proceedings "until the plaintiffs have presented their complaint to the appropriate State Courts and the State Courts have finally determined the issues." The prayer for a dismissal was based upon the contention that the State court procedures set up by the statute were a continuation of the administrative process, and that since the plaintiffs had failed to appeal to the Circuit Court of Jefferson County, they had not exhausted their administrative remedies and had no standing in this Court. The alternative prayer for a stay was predicated upon the doctrine of "equitable abstention," recognized in cases such as Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; and Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, and applied from time to time by this Court. See e. g. N. A. A. C. P. v. Bennett, D.C. Ark., 178 F.Supp. 188 and 178 F.Supp. 191; see also Union Carbide & Carbon Corp v. White River Distributors, Inc., D.C.Ark., 118 F.Supp. 541.

At a pretrial conference the Court announced that it was reserving its ruling on the motion pending a hearing on the merits. The defendants then answered and, while reserving their rights under their motion, took the position that there had been no unconstitutional application of the pupil assignment law.

A hearing on the merits was held on December 16, 1959, in the course of which the Court received documentary evidence and heard testimony and oral arguments. At the conclusion of the hearing briefs were requested and the same have now been filed and considered.

I. The Failure Of The Plaintiffs To Resort To The State Court As A Failure To Exhaust Their Administrative Remedies

It is undisputed that the plaintiffs followed all of the administrative procedures before the School Board prescribed by Sections 7 and 9 of Act 461 of 1959. On the other hand, it is admitted that the plaintiffs did not pursue the remedy in the State court provided by Section 9 of the Act.

Section 9 of the Act states that the findings and actions of a local school board with respect to the assignment of a pupil to a particular school shall be final, except that where it is contended that an individual assignment is violative of the Constitution of the United States or of the Constitution or laws of the State of Arkansas, the pupil affected may appeal to the circuit court "on such ground alone," that the trial in the circuit court shall be "de novo," and that an appeal shall lie to the Supreme Court of Arkansas "in the same manner as appeals may be taken in other suits at law." The "petition for appeal" must set forth "the facts relevant to such pupil as bearing on the alleged denial of his rights under the United States Constitution or the Constitution and/or laws of the State of Arkansas," and must be accompanied by a surety bond approved by the clerk of the circuit court and conditioned upon the payment of all costs of the appeal if the same is not sustained. A copy of the petition for appeal must be lodged with the president or secretary of the school board concerned. The filing of an appeal does not supersede the assignment action complained of, and the court may not supersede such action pending the appeal, except after a preliminary hearing and a prima facie showing that the board action was unlawful and re--

sulted in "manifest detriment" to the child involved.

In the light of the decision of the Court of Appeals in this case, it is clear that the plaintiffs were required to exhaust their administrative remedies before the School Board, and this they have done. Whether they were required to carry their contention into the State courts, as contemplated by the statute, presents another question. The Court is persuaded that the plaintiffs were not so required.

Ordinarily, a party who claims that his federal constitutional rights have been abridged by State administrative action, although required to exhaust his State administrative remedies, is not required to exhaust judicial remedies in the State courts before resorting to the federal courts for the vindication of his rights. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. The difficulty with defendants' position on this phase of the case is that the review available in the State courts appears to have all of the characteristics of a conventional judicial proceeding. The filing of the petition for appeal apparently amounts to the institution of a lawsuit, with the furnishing of a copy of the petition to the president or secretary of the board serving the function of process. The trial is de novo and obviously results in a judgment binding upon the parties, at least so far as the particular assignment in question is concerned. Cf. Lane v. Wilson, supra, 307 U.S. at page 274, 59 S.Ct. at page 875, and City Bank Farmers' Trust Co. v. Schnader, 291 U.S. 24, 30, 54 S.Ct. 259, 78 L.Ed. 628. See also Davis, Administrative Law Treatise, § 23.16. Moreover, in view of the "separation of powers" provisions contained in the Arkansas Constitution of 1874, Article 4, Sections 1 and 2, it would not appear that the Arkansas Legislature could validly confer administrative powers on the circuit courts.

The court procedure provided by Act 461 is essentially similar to that set up by the North Carolina pupil assignment law. In Carson v. Warlick, 4 Cir., 238 F.2d 724, 729, the Court said in connection with the North Carolina procedures:

"It is clear, however, that the appeals to the courts which the statute provides are judicial, not administrative remedies and that, after administrative remedies before the school boards have been exhausted, judicial remedies for denial of constitutional rights may be pursued at once in the federal courts without pursuing state court remedies. Lane v. Wilson, 307 U.S. 268, 274, 59 S.Ct. 872, 83 L.Ed. 1281 * * *."

See also Holt v. Raleigh City Board of Education, D.C.N.C., 164 F.Supp. 853, affirmed, 4 Cir., 265 F.2d 95.

## II. Equitable Abstention

A plea for the application of the doctrine of equitable abstention in a pupil assignment case was addressed to and rejected by the District Court in Holt v. Raleigh City Board of Education, supra, 164 F.Supp. at page 869.

The Court is convinced that the doctrine of equitable abstention should not be applied here. This is not to say that the Court feels that an authoritative interpretation of Act 461 by the courts of Arkansas would not be of value to the school boards throughout the State in the overall application of the Act, or that such an interpretation might not, in certain contexts, be helpful to the federal courts in determining whether the Act has been fairly and constitutionally applied to individual students. Nor does the Court mean to be understood as giving unreserved approval to any policy of litigants in cases of this kind to avoid adjudication of their claims in the State courts, particularly when such policy might seem to involve refusals to invoke the protective provisions of State constitutions or attempted waivers of underlying questions of State law. Cf. N.A.A.C.P. v. Bennett, supra, 178 F. Supp. at page 194.

But the questions now presented in this forum are essentially federal constitutional questions which would probably not be eliminated by State court

2

13

construction of the statute, and the Court does not feel that such construction would pose those questions in a substantially different frame. See Harrison v. N.A.A.C.P., supra, 360 U.S. at page 177, 79 S.Ct. at page 1030. In view of the federal questions presented, the history of the case, and the time elements involved, it is felt that the contentions of the plaintiffs should be passed upon at this time and by this Court.

### III. The Merits

Preliminary to a discussion of the merits, some observations as to the applicable general principles of law seem to be in order.

There can now be no question that under the Brown decisions compulsory segregation of the races in the public schools is unconstitutional. The defendants so concede. It is also conceded by the defendants that implementation of the principles laid down in Brown cannot be made to yield to public disagreement with the idea of desegregation or be defeated by resort to unlawful violence. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5.

But, Brown, while outlawing compulsory public school segregation, does not require affirmative race mixing in the schools. In that connection, the following language of the Court in Briggs v. Elliott, D.C.S.C., 132 F.Supp. 776, 777, is by now classic:

"* * * [The Supreme Court] has not decided that the federal courts are to take over or regulate the public schools of the states. It has not decided that the states must mix persons of different races in the schools or must require them to attend schools or must deprive them of the right of choosing the schools they attend. What it has decided, and all that it has decided, is that a state may not deny to any person on account of race the right to attend any school that it maintains. This, under the decision of the Supreme Court, the state may not do directly or indirectly; but if the schools which it maintains are open to children of all races, no violation of the Constitution is involved even though the children of different races voluntarily attend different schools, as they attend different churches. Nothing in the Constitution or in the decision of the Supreme Court takes away from the people freedom to choose the schools they attend. The Constitution, in other words, does not require integration. It merely forbids discrimination. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation. The Fourteenth Amendment is a limitation upon the exercise of power by the state or state agencies, not a limitation upon the freedom of individuals."

See also Kelley v. Board of Education of the City of Nashville, Tennessee, 6 Cir., 270 F.2d 209; Avery v. Wichita Falls Independent School District, 5 Cir., 241 F.2d 230; School Board of the City of Charlottesville, Va. v. Allen, 4 Cir., 240 F.2d 59; Dove v. Parham, supra, 176 F.Supp. at page 250; Aaron v. Cooper, D.C.Ark., 169 F.Supp. 325; and Aaron v. Cooper, D.C.Ark., 143 F.Supp. 855, affirmed, 8 Cir., 243 F.2d 361.

While compulsory segregation must be eliminated in the public school districts where it has prevailed heretofore, not all of it must be eliminated at once. Where local school authorities recognize their obligation to eliminate racial discrimination and make a prompt and reasonable start toward that objective, Brown permits a period of transition, the length of which may vary from district to district depending upon a number of factors. Brown v. Board of Education, supra, 349 U.S. at pages 299–301, 75 S.Ct. at pages 755–757; Kelley v. Board of Education, supra; Aaron v. Cooper, supra, 243 F.2d 361. And during this transition period it is not unlawful for a school board to require Negro students desiring to transfer to formerly all-white schools, or white students de-

**514**

siring to transfer to formerly all-Negro schools, to submit to reasonable tests and examinations to determine their fitness for such transfers, even though such tests and examinations are not required of students of either race who evidence no desire to change schools. Beckett v. School Board of Norfolk, Virginia, D.C. E.D.Va., 181 F.Supp. 870, Thompson v. County School Board of Arlington County, Virginia, D.C.Va., 166 F.Supp. 529, 535, affirmed in part and vacated in part, Hamm v. County School Board of Arlington County, 4 Cir., 263 F.2d 226 and 264 F.2d 945.

 It should be emphasized, however, that the very concept of a transition period implies a movement away from a school system characterized by compulsory segregation toward a system free therefrom. Once there is a demand on the part of interested students to attend nonsegregated schools, the burden is upon the local school board to initiate some plan or policy which, within the tolerance of Brown, will lead eventually to a racially nondiscriminatory school system.

 The responsibility for devising acceptable plans is upon the local school boards rather than upon the federal courts, and the local boards, so long as they act in good faith, have considerable latitude in choosing the policies they desire to pursue.

 Once a discernible and acceptable transition plan has been worked out, it may develop that the particular individuals who originally applied for admission to formerly segregated schools may not achieve their ends. And, when individual assignments are considered under such a plan, it seems to the Court that the race of a student who may desire to be assigned to a particular school may be considered to a limited extent as one of a number of factors going into the total equation. Otherwise stated, the Court is of the view that within limits a school board has the right, during the transition period, to recognize the fact that the assignment of a child of one race to

a school attended exclusively or predominantly by members of another race may present serious problems for the child, and that, all factors considered, such an assignment may not be in the child's best interests, no matter how much it may be supposed that such an assignment might advance the total interests or aspirations of the race to which the child belongs.

 But, until at least a transition plan is formulated and expressed, no real start has been made toward the elimination of compulsory segregation, and no transition period exists within which the delays and limited racial considerations countenanced by Brown can have play.

 While the Court of Appeals has held in this case that Act 461 of 1959 is constitutional on its face, that Court has made it clear that the statute cannot be used validly to perpetuate segregation or to circumvent the Brown decisions. In this connection the Court said (at pages 136–137 of 271 F.2d):

"Thus, so far as the face of the statute is concerned, there is no basis to say, in legal construction, that the Act is designed, or that it can only operate, to maintain segregation and to prevent integration in a school system. On the other hand, as emphasized in the Shuttlesworth case [Shuttlesworth v. Birmingham Board of Education, D.C.] 162 F.Supp. [372] at page 384, the statute cannot, because of its facial constitutionality, be made to serve through artificial application, as an instrument for maintaining or effecting a system of racial segregation. It cannot be given an application designed to escape or by-pass the Brown cases. Recognition of and obedience to the holdings of the Brown cases must implicitly exist in its operation and application.

"Accordingly, any scrutiny which the federal courts may be called upon to make of what has been done under such a statute, where a charge

of racial discrimination is involved, must necessarily be within the focus and tests of its lack of disharmony with the objective, the obligation and the responsibility dictated by the Brown cases. Insofar as the question of desegregation is concerned, a placement or assignment statute, such as the Arkansas Act, is entitled to have play, on the basis of state sovereignty, as a means or an aid for effecting a sound and orderly distribution of pupils, in relation to all the problems of a public school system, except those of purely racial consideration. Differences in the practical problems of eliminating racial segregation under the varying situations of states or local districts must look for their margins of latitude in effecting that result to the principles laid down in Brown v. Board of Education, 349 U.S. 294, 299–300, 75 S.Ct. 753, 756, 99 L.Ed. 1083.

"In this field of constitutional paramountcy, a placement or assignment statute is entitled to be accorded recognition only as an implement or adjunctive element on the part of a state for effecting an orderly solution to its desegregation difficulties, in proper relationship to its other school-system problems, but with a subservience to the supreme-law declaration of the Brown cases as to all imposed segregation and the obligation owed to get rid thereof within the tolerance entitled to be allowed play under these decisions for accomplishing that result."

■■ Not only will an administration of the Act so as to preserve segregation be condemned as unconstitutional, but in this Court's estimation a school board may not administer the Act so that, as a matter of permanent policy, only Negro students of exceptional ability can gain admittance to formerly all-white schools. And, even during a transition period, the tests and examinations administered to students desiring to attend nonsegregated schools must not

be so difficult or unreasonable as in themselves to be discriminatory. See Beckett, supra.

It is contended by the plaintiffs that the application of Act 461 of 1959 by the defendants is discriminatory in that the criteria prescribed by the Act and the regulations are not impartially applied to all students, that the students in the District are initially assigned by race, that the standards in question are applied only to Negro students seeking transfers to a nonsegregated school, that the onus of establishing their right to such transfers is placed upon such students, and that they are subjected to requirements and tests that are not applied to white students or to Negro students who are willing to continue in attendance at the Townsend Park School. It is contended further that the defendants have applied to the three particular students here involved criteria that are unlawful or irrelevant, that the relevant and lawful criteria in the Act and regulations have not been fairly applied to those students, and that the denials of their applications for transfers were based upon their race.

It has been pointed out that the defendants have formulated no affirmative plan for integration of the schools in the District such as have been worked out at Little Rock, at Nashville, Tennessee, and elsewhere. It is the position of the Board that by implementing and putting into operation Act 461 the District has abolished unlawful racial discrimination in the assignment of pupils as required by the Brown decisions. The Board insists that plaintiffs' applications for transfers were fairly considered and measured by lawful and relevant criteria, and that the denials of plaintiffs' applications were not unlawfully discriminatory.

As stated, the Board on August 17, 1959, adopted assignment and transfer regulations. The regulations provide that initial assignments of students enrolling in the schools of the Dollarway District for the first time shall be made by the Board after considering the rec-

ommendations of the Superintendent of Schools. That provision of the regulations would seem to apply to first-graders just enrolling in school and to students transferring their enrollment to the Dollarway District from some other district.

Under the regulations all students enrolled in the schools of the District during the 1958–59 school year were to be assigned initially for the 1959–60 school year to the school that they attended during the former year. In view of the history of segregation in the District, this meant that all Negro students enrolled in the District in 1958–59 were assigned initially for the 1959–60 school year to the Townsend Park School, and that white students similarly situated were initially assigned to the Dollarway School for the 1959–60 school year. These initial assignments were automatic, but provision was made for the hearing and determination by the Board of objections to the original assignments or of requests for reassignment or transfer.

With regard to assignments for school years subsequent to the 1959–60 term, the regulations provide that during the month of May of each year and prior to the close of school, the Superintendent shall submit to the Board his "recommendations as to the assignments for the next school year of each child enrolled in the schools of the District." Thereafter, but prior to the end of the school term, the Board is to "assign each child in the schools of the District to a school for the next school year." Notice of such assignments is to be given by notation on the report cards given to the students at the close of the term. If for any reason a child does not receive a report card, written notice of the assignment is to be mailed to the child's parents. It is noted that under this portion of the regulations the school authorities will commence the performance of their assignment functions for the 1960–61 school year in May of the current year.

The regulations also provide for the processing of objections to initial assignments and requests for reassignments or transfers. A method for the filing of such objections and requests is provided and a time limit is prescribed within which such objections and requests must be filed. Upon the filing of an objection or a request for reassignment the Board is required to hold a hearing which shall commence within 30 days of the filing, and the parents of the child involved are to be given at least seven days written notice of the date, time, and place of the hearing. Both child and parents must attend the hearing, and they may have such representation as they may desire. The hearing on each application is to be separate from the hearing on any other application. The Board is required to hear the witnesses and consider the documentary evidence presented and is authorized to conduct such investigations as it may deem proper; and the Board may require a child upon reasonable notice to submit to interviews by agents or representatives of the Board, professional or otherwise, and to take oral, written, and physical examinations.

As soon as possible after the hearing, the Board is to take final action on each application considered, and is to make findings and conclusions which become part of the official records of the Board. The parents of the child are to be notified by mail of the Board's final action, and may except thereto on the ground that such action violates a federal constitutional right of the child or some right accorded by the Constitution or laws of the State of Arkansas. Prompt action is to be taken on the exceptions, and, in any event, exceptions are to be determined within 15 days after they are filed. Until a reassignment is made, the child in question must attend the school to which he was assigned originally. The Board is given the right to make changes of assignments at any time, but any changes that are made are subject to objections and exceptions, as in the case of original assignments.

Article V of the regulations sets out assignment and transfer standards and

incorporates the statutory criteria previously mentioned; but the Board is not necessarily limited to those criteria and is to consider "all relevant matters pertaining to the best interest of the children, the efficient operation of the schools, and the efficient carrying out of the best possible educational program." The regulations also contain certain miscellaneous provisions which the Court deems it unnecessary to abstract.

Those portions of the regulations which require the execution of certain prescribed forms, and which provide for the giving of notices, for the holding of hearings and subsequent Board action, and for the filing and determination of exceptions to Board action, appear to be fair, adequate, and reasonable. Further, in 1960–61 and subsequent years, assignment actions will be taken far enough in advance of the opening of each new school term to enable dissatisfied students and parents to pursue and exhaust their administrative remedies and perhaps to secure judicial review of final Board action, at least at the trial court level, prior to the commencement of the school terms for which the challenged assignments are effective.

The decision of the Court of Appeals to the effect that Act 461 is constitutional on its face clearly implies that some of the standards contained in the statute are valid in the view of that Court. Thus, it is obvious that some of the statutory criteria carried forward into the Board's regulations are valid. Others, while vague, would appear susceptible of a constitutional construction and application.

 When the Board put the statute and its own regulations into actual operation, the result was that the schools were opened on a segregated basis, and the criteria in question were applied only to the three Negro plaintiffs who sought transfer from Townsend Park to Dollarway. If the Court were convinced

that the future application of the statute and regulations would be permanently characterized by initial assignments made on the basis of race, and that the assignment standards would be applied only to students seeking to attend schools formerly attended exclusively by students of another race, it would have little hesitation in saying that such an application would be invalid. See Holt v. Raleigh City Board of Education, supra, 265 F. 2d 95; and Hamm v. County School Board of Education, supra, 264 F.2d 945.

However, future application of the pupil assignment law will not necessarily be so characterized. Under the statute and regulations it is open to the Board to give to each student a free and reasonable opportunity to express his preference as to the school which he is to attend the following year, and it is open to the Board to consider the case of each student on an individual basis in the light of the valid criteria contained in the statute and regulations, and to make individual assignments based on valid and constitutional bases, free from any consideration of race.

 Further, some evidence in the record and some statements in the defendants' brief indicate that in the future the Board may be prepared to adopt a more liberal assignment policy with respect to students in the lower grades, while making rather strict requirements with respect to changing the school assignments of higher grade students who have always attended one particular school and who have become established therein. The Board's theory in this connection, supported by the testimony of its experts, is that a transition from a segregated to a nonsegregated school can be more easily effected at the lower grade levels, and that, entirely aside from racial considerations, "lateral transfers" of students at the higher grade levels should not be made in the absence of exceptional circumstances.[6] The validity of the

---

6. By a "lateral transfer" is meant the transfer of a student from one school to another at the same grade level. It does

not include a promotional transfer of students. Since the Dollarway District has only two schools, in each of which

Board's theory has been challenged by the plaintiffs in this case, but the Court cannot say that it is not a tenable theory, or that it may not be adopted by the Board as a proper part of a policy which would satisfy the Brown requirements at least during a transition period.[7]

Since the decision of the Court of Appeals was rendered, the Board has undertaken to apply the Act and regulations to the three individual plaintiffs here involved.[8] In May it must begin the consideration of the assignments of all students for the 1960–61 school year, and thereafter must process such objections to assignments and requests for transfers as may be made.

■ The Board's application of the statute up to this time has not been so extensive as to afford a basis for a forecast as to how the Act will be applied in the future, and the Court does not feel that the Board has yet expressed, if indeed it has formulated, any affirmative plan to end compulsory segregation within the Dollarway District.

The Board's approach to its problem seems to have been essentially negative. Although the Board has disclaimed any intention of discriminating against Negroes in the application of the Act, and has professed to recognize its obligations under Brown, it has not announced any affirmative policy with regard to the conditions under which a Negro student will be admitted to Dollarway School. And

while it has adopted a policy against lateral transfers at the higher grade levels, except in unusual circumstances, there has been no definite affirmative recognition of the corollary of its policy, which corollary would require a liberal treatment of transfer requests at the lower grade levels. Nor has the Board given any indication of what it would consider to be "exceptional circumstances" which justify a departure from its general policy at the higher levels.

Until the Board makes an affirmative declaration of its policies the Court does not feel that the Board has discharged its duty under Brown. Of course, the Court cannot appraise any plan until it has been formulated and expressed.

■ It should be repeated that the Board is not required to adopt any particular policy. It has a number of choices. As indicated, it may apply the assignment criteria of the statute and regulations to all students at all grade levels without any regard to the race of the respective students. Should such a policy be adopted and pursued in good faith, compulsory segregation would be at an end, and there would be no transition period. On the other hand, the Board may deem it better to apply the Act so as to eliminate racial discrimination more slowly and over a transition period under a plan which might or might not provide for automatic integration at various grade levels.

all twelve grades are taught, there are no promotional transfers within the District.

7. Cf. the Nashville "grade-by-grade" plan of integration commencing with the first grade, which plan was approved in Kelley v. Board of Education, supra; and contrast the "Blossom Plan" adopted at Little Rock and approved by the Court of Appeals for this Circuit, under which plan integration starts at the high school level and works downward. It is noted in passing that at Little Rock some Negro students have been admitted to formerly all-white schools, and in connection with such admissions Act 461 has been employed. The validity of the actions of the Little Rock School Board in denying the

requests of other Negro students for similar assignments is now the subject of litigation in this Court.

8. When this case was before this Court originally, there had been no actual application of the Act by the Board, and the Board's regulations had not been adopted. When the case was argued before the Court of Appeals, the regulations had been adopted but had not been applied to any individual students. That the Court of Appeals did not consider that the mere adoption of the regulations constituted a sufficient compliance with Brown is indicated by the fact that it directed the entry of an injunction in terms that have been mentioned.

But, if the Court is to determine whether the Board's use of the statute is, in general, a sufficient compliance with the Brown requirements, and whether the statute has been constitutionally applied to individual students, it must know what the Board's assignment policies are. Further, it seems to the Court that the affected students have a right to know in advance the ground rules under which the Board will operate in making assignments, and to know which students will have a reasonable expectation of being assigned to a nonsegregated school during the transition period, if there is to be such a period.

In the circumstances here present the Court is not willing to say at this time that the Board's future application of the statute will be unconstitutional. However, the Board will be required to submit to the Court within 30 days an affirmative statement of the policies that it intends to pursue in the application of the Act so as to end compulsory segregation in the public schools. When this is done, the Court should be able to say whether the Board's contemplated use of the statute will constitute an acceptable plan. If the statement of the Board sets forth a plan reasonably designed to put an end to enforced segregation, and if it appears to have been adopted in good faith, with the sincere purpose of achieving the results required by Brown, it will be sympathetically received.

■ Turning now to the more specific question of the application of the statute to the three Negro plaintiffs in this case, it should first be said that the Court does not feel that in the rather peculiar circumstances existing in the Dollarway District last September the initial assignments of the plaintiffs to the Townsend Park School were unlawful, although as indicated, initial assignments based on race are, in general, objectionable. The status of this case at that time created a condition of uncertainty as to how the schools were to be operated and the students assigned. The opening of school was imminent. The students had to be assigned initially

on some basis. The Board may well have felt that the quickest and most efficient method of making the initial assignments would be to send the children to the schools they had attended the preceding year, and to leave complaints about such assignments to be processed in accordance with the procedures prescribed by the statute and regulations. The students and their parents were notified promptly of the initial assignments; they promptly objected; and their objections were heard and determined expeditiously.

■ It has been pointed out that in the preliminary stages of desegregation discrimination is not to be found in the fact that Negro students desiring to enter formerly segregated schools are required to take tests and submit to examinations not required of other students. These plaintiffs were the only ones in the District who desired to enter an all-white school. Had any white students applied for transfer to Townsend Park, there is no reason to believe that they would not have been subjected to the same tests and examinations. The tests, interviews, and examinations were not grueling or severe, and none of the plaintiffs manifested any objection to them at the trial.

Comes now the ultimate question of whether the Board acted in an unconstitutional manner in denying the plaintiffs' applications for reassignment after the plaintiffs had taken the tests, submitted to the interviews, and appeared at the hearing.

■■ In answering that question the Court is performing the conventional judicial function of reviewing the findings of an administrative agency, and the scope of its review is limited. It is not the function of this Court to make educational policy, or to resolve conflicts in educational theory. Neither is it the function of the Court to assign school children to particular schools, or to substitute its judgment for that of the school board as to which school a particular child should attend. Mere ad-

ministrative errors cannot be corrected here. All this Court can and should do is determine whether the federally protected rights of any of these three individual students were violated by the Board in refusing the respective requests for transfer to the Dollarway School. If the Board did not employ unconstitutional standards in passing upon the requests of these students, if it acted in good faith and upon a substantial evidentiary basis, and if its actions were not arbitrary or capricious, then plaintiffs are entitled to no relief in this action, even though the Court might have come to some other conclusion as to the proper disposition of their applications. Thompson v. County School Board of Arlington County, Virginia, D.C.Va., 159 F.Supp. 567 and 166 F.Supp. 529. See also Carson v. Board of Education, 4 Cir., 227 F.2d 789; cf. Brooks v. School District of the City of Moberly, Missouri, 8 Cir., 267 F.2d 733.

The parties have brought into the record in this case everything that was considered by the Board in passing upon the applications in question. In addition, the Court heard the oral testimony of the plaintiffs and certain of their parents, the testimony of the president of the Board and certain other school officials, and the testimony of experts called by both sides.

From a consideration of the record before the Board and of the testimony in this case it is clear that in refusing the requests for transfers the Board took into consideration criteria which are unquestionably valid in and of themselves, and had those been the only standards employed, this Court would probably not feel justified in holding that any racial discrimination had been practiced against any of the plaintiffs. It is equal-

ly clear, however, that the Board considered the race of each of the applicants and gave that factor some weight in reaching its conclusions. The Court is not able to say from the record how much weight was given to the race of the respective applicants, and what the Board's conclusion in any instance would have been had race been left entirely out of consideration.

The Court is convinced that in performing its functions the Board acted with subjective good faith and conscientiously tried to avoid what the Board considered to be unlawful discrimination. Had the Board's determinations been made in the light of an adequately articulated plan or policy, acceptable under Brown, the Court might well conclude that the racial considerations did not exceed permissible limits during the transition period.

■ As pointed out, however, at the time the Board made its determination it had not given expression to any affirmative plan and had not established any transition period. Such being the case, the Court is forced to the conclusion that the Board had no right to consider the race of these students in passing upon their applications, and that its action in so doing cannot be sustained.

■ On the other hand, the Court does not feel that any good purpose would be served by remanding the case to the Board for further consideration of the individual assignments without regard to race,[9] nor is the Court of the opinion that the Board should be ordered to admit the students to the Dollarway School for the remainder of this term. Apart from the time element, the Court feels that the Board should be given a reasonable opportunity to work out an acceptable plan for the elimination of racial dis-

9. In some situations such a course would appear to be normal and proper. But in this case the school year is far advanced and would be still farther advanced before any reconsideration could be had and reviewed by this Court in the event that the Board adhered to its original determinations. Whether or not these students should have been transferred to the Dollarway School in September, it certainly would appear unwise to move them this late in the year. Until the Board works out its plan and submits it to the Court, administrative consideration of these assignments would seem to serve no useful purpose.

crimination without being compelled to accept in advance Negro students at the higher grade levels in contravention of the Board's announced general policy against lateral transfers at those levels. As was said by the Court of Appeals in a slightly different context in its opinion in this case (at page 138 of 271 F.2d):

> " * * * we do not think that it is judicially wise or necessary to impatiently declare that desegregation should * * * be sought to be achieved, without regard to the overall pattern which the District is entitled to create through a constitutional application of the Placement Act * * *."

In reaching its conclusion this Court does not overlook the fact that its decision means that the oldest of the three plaintiffs, a senior, must complete her high school education at Townsend Park. However, she has spent her entire school life in that school and its predecessor, and the evidence shows that she will not suffer educationwise by finishing out her final year in that institution. Her personal interest in and desire to attend an integrated school does not outweigh the larger interests which the Court is required to consider. Future assignment of the two younger plaintiffs, both of whom are in the ninth grade, will be subject to further consideration by the Board in the light of whatever acceptable plan it may be able to evolve.

There is one other matter to which reference should be made. The evidence reflected that the hearing before the Board was marred by a disturbance created outside the school by a crowd of white people whose presence there may well have been in part coincidental as a football game was being played nearby

on the same night the hearing was held. This disturbance was marked by abusive language hurled at the Negroes present at the hearing, by the throwing of bottles in the halls of the Dollarway School, by the breaking of windows, and by some physical violence, fortunately not serious, directed at the persons of some of the Negroes as they left the school.

While it should be said that there is nothing to indicate that the Board had anything to do with this disturbance, or sympathized with it, or was influenced by it, and while the president of the Board talked to the people and urged them to disperse, this Court wishes to emphasize that such disturbances are not to be condoned, and that the Board's efforts to eliminate racial discrimination in the public schools must not be permitted to yield to lawlessness, whether inside or outside the schools, and whether organized or spontaneous. The Court feels that the Board fully recognizes this principle, and it is the hope of the Court that the general public will also recognize it.

In accordance with the mandate of the Court of Appeals an injunction will be issued commanding the Board to eliminate the compulsory racial segregation which has heretofore prevailed in the Dollarway District. The order will also provide for the submission of an affirmative plan by the Board, and jurisdiction of the cause will be retained for the purpose of passing upon such plan as may be submitted and for the entry of such other and further orders as may be necessary in connection with such plan. However, in order to keep the record as clear as possible, the supplemental complaint herein will be dismissed. Each side should bear its own costs.