Earnestine DOVE, a Minor, by her Father and Next Friend, William Dove, James Edwards Warfield, a Minor, by his Father and Next Friend, New James Warfield, and Corliss Smith, a Minor, by her Mother and Next Friend, (Mrs.) Sarah Smith, Plaintiffs,

v.

Lee PARHAM, Joe Pierce, Robert Bryant, Carl Purnell, and Orville Phillips, Respectively President, Secretary and Members of the Board of Directors, Dollarway School District Number 2, Dollarway School District Number 2, a corporation, and Charles L. Fallis, Superintendent of Public Schools of said District, Defendants.

Civ. A. No. 3680.

United States District Court
E. D. Arkansas, W. D.
April 30, 1960.

George Howard, Jr., Pine Bluff, Ark., Robert Carter, New York City, for plaintiffs.

Herschel H. Friday, Jr., Robert V. Light, Little Rock, Ark., for defendants.

HENLEY, Chief Judge.

On February 19, 1960, this Court filed a memorandum and entered a decree which, among other things, directed the defendants herein to file an affirmative statement of the policies which they pro-

pose to pursue in applying the Arkansas Pupil Assignment Law, Act 461 of 1959, and their own regulations implementing that statute to the students of the Dollarway School District No. 2 of Jefferson County, Arkansas, so as to eliminate compulsory racial segregation in the schools of said district, as required by the Brown decisions and by the decisions of this Court and of the Court of Appeals in this case.[1]

Both sides were dissatisfied with certain aspects of the Court's February 19 decision, and an appeal and a cross appeal pending in the Court of Appeals are set for argument on May 13. The defendants, however, did not ask for any stay of that portion of the decision which directed the filing of an affirmative statement of policies, and such a statement entitled "Report of Defendants" was filed on March 21, 1960.

On April 6, 1960, plaintiffs filed objections to the report, and the report and objections thereto were submitted upon oral argument on April 13, 1960.

As noted, the decision of February 19 required the defendants, hereinafter called the Board, to submit an affirmative statement of its assignment policies. The Court pointed out, however, that the Board was not bound to follow any particular policy, saying (181 F.Supp. at pages 504, 518):

"* * * the Board is not required to adopt any particular policy. It has a number of choices. As indicated, it may apply the assignment criteria of the statute and regulations to all students at all grade levels without any regard to the race of the respective students. Should such a policy be adopted and pursued in good faith, compulsory segrega-

tion would be at an end, and there would be no transition period. On the other hand, the Board may deem it better to apply the Act so as to eliminate racial discrimination more slowly and over a transition period under a plan which might or might not provide for automatic integration at various grade levels."

In the February 19 opinion the view was expressed that once a discernible and acceptable transition period had been established it might develop that the particular individuals who had originally applied for admission to formerly segregated schools might not achieve their ends; and, further, that during a transition period a school board in making assignments might constitutionally consider race to a limited extent as one of a number of factors going into the total equation, but that until a transition period has been established the race of the respective students cannot validly be considered in determining the schools to which they are to be assigned. It was also held that during a transition period students of one race desiring transfers to schools formerly attended exclusively by students of another race may be required to submit to tests and examinations not required of students not seeking such transfers, provided that such tests and examinations are not unreasonable or so arduous as to be discriminatory in themselves. Dove v. Parham, supra, 181 F. Supp. 504. For present purposes it must be assumed that the views just mentioned will meet with the approval of the Court of Appeals.

In its report the Board recognizes, as it has in the past, its obligation to establish and maintain a racially non-discriminatory school system. It points out that

---

1. This case is now in its third phase in this Court. The first opinion herein was filed on July 31, 1959, and is reported as Dove v. Parham, D.C.Ark., 176 F.Supp. 242. That decision in part was reversed by the Court of Appeals, Parham v. Dove, 8 Cir., 271 F.2d 132. Following the reversal a supplemental complaint was filed, and the case again was tried in this Court on December 16, 1959.

The opinion of February 19, 1960, reported as Dove v. Parham, D.C.Ark., 181 F.Supp. 504, contains a recitation of the facts and history of the case to that date. The Brown decisions referred to in the text are, of course, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

any plan that may be worked out must be a flexible one, and that ultimately the assignment of any particular student must be determined by reference to the facts and circumstances of the particular case. The Board states that it proposes to operate under the Pupil Assignment Law and under its own regulations, and that during the transition period race will be given consideration "as an existing fact and factor brought into play by the application of governing criteria."

The Board's general plan of operations, incorporated in the report, may be summarized as follows:

1. With regard to students presently enrolled in the Dollarway District, the Board is opposed to "lateral transfers" of such students in ordinary cases; but such transfers may be granted in "exceptional cases" under certain conditions.[2] An "exceptional case" is said to exist where a student "desires and realistically needs" courses or facilities available, at the school to which transfer is sought which are not available at the school from which transfer is sought, or where continued attendance at the school from which transfer is sought would entail "actual and substantial physical or economic risk, danger, or hardship to the pupil."

If a student establishes that his case is exceptional, a lateral transfer may be granted if the applicant, in the Board's opinion, can make necessary adjustments and perform and achieve satisfactorily in the school to which transfer is sought. A student will not be considered as able to perform and achieve satisfactorily in such school if the Board finds, on the basis of reasonable tests, examinations, observations, and other relevant data, that the student cannot do satisfactory work, or that the curriculum pace or general academic standards of the school to which transfer is sought will have to be reduced or lowered in order for the transferring student to do reasonably satisfactory work, or that the curriculum pace or other competitive factors would probably discourage the transferring student from completing his public school education or would prompt him to request a re-transfer.

Even in an exceptional case the request of a qualified student may be denied if the Board finds that, if the transfer is granted, such student will probably "by his own voluntary conduct create a disturbing influence that would be detrimental to the overall welfare of the school to which transferred and other pupils therein."

Applicants for lateral transfers will be required to submit to tests and examinations not required of all students, but such tests are not to be unduly burdensome.

2. Students already enrolled in the district probably will be assigned for each succeeding school year to the respective schools attended by them during the preceding year unless facts indicating an "exceptional case" are brought to the Board's attention by students, parents, school personnel, or other interested persons, or by the Board's own investigations.

3. As to first grade students who have never been in school, the Board recognizes that the considerations which make lateral transfers of previously enrolled students undesirable do not apply, and that in assigning new first graders the Board is not concerned with "exceptional cases" as that term is used in connection with lateral transfers. The Board states that in the case of first graders there must be a more extensive review of all facts relevant to the assignment criteria than in the case of students formerly enrolled. The Board undertakes to engage in this more extensive review, and asserts that, where possible,

---

2. As stated in the Court's opinion of February 19, a "lateral transfer" of a student is a transfer from one school to another at the same grade level, as contrasted to a "promotional transfer." The Dollarway District maintains only two schools, in both of which all twelve grades are taught; hence, there are no promotional transfers within the district.

pupil and parent preference will be recognized.[3]

The report concludes as follows:

"The length of the transition period cannot be determined at this time but will continue for that period necessary to complete the constitutional adjustment required. As time goes by, race will probably eliminate itself as one of the factors brought into play by the non-discriminatory application of prescribed assignment criteria to all pupils.

"The Board respectfully submits this affirmative statement of policy with the assurance to the Court that it has made a conscientious effort to be as definite as possible under the circumstances. It intends to proceed in utmost good faith to comply with all orders of this Court and trusts that this statement will be accepted by the Court as meeting the requirements of the Court's order. If anything additional is desired, the defendants stand ready to furnish it upon the request of the Court. However, the defendants point out that they must have an ample opportunity to establish a pattern of operation that will meet all constitutional requirements and are entitled to the judicial patience, referred to by the Court of Appeals and evidenced by this Court's opinion."

It is contended by the plaintiffs that the plan incorporated in the Board's report is not a sufficient compliance with Brown, and that it is actually nothing more than a scheme to perpetuate segregation in the District. The Board, on the other hand, contends that the plan has been submitted in good faith, that it meets constitutional requirements, and that it establishes a transition period during which race is a proper factor for consideration in the assignment of students.

From a reading of the report it is apparent that the Board's plan purports to eliminate compulsory segregation over a period of time without automatic integration at any grade level. That plan, of course, like any other assignment plan which involves the exercise of human judgment and good faith, is capable of an unconstitutional application. The plan does not appear to be unconstitutional on its face, however, and the Court is not willing to presume that it will be applied unconstitutionally. In fact, the presumption is the other way.

The provisions for the initial assignment of first graders are fair on their face and are sufficient, if applied in good faith, to give to at least some Negro children entering school for the first time in September of the current year a reasonable chance of being assigned to the heretofore all-white Dollarway School. Once they are admitted to that school, the Board's policy against lateral transfers will tend to keep them there. As has been pointed out, the Board has stated that weight will be given to the preferences of the parents of first grade students as to the school to which such students are to be assigned initially, and the Court assumes that no Negro child for whom application is made for an assignment to the Dollarway School at the first grade level will be excluded from Dollarway solely on the basis of his race.

Further, the plan recognizes that lateral transfers may be granted under certain conditions in exceptional cases. The definition of an exceptional case and the

3. The report also contains provisions relative to assignments of students who transfer into the Dollarway District from other school districts. Those provisions are not abstracted herein because the Court considers them to be subsidiary in importance to the provisions for the assignment of students already in the district. If the provisions for the assignment of students already enrolled and of first graders entering school for the first time are valid, problems incident to the assignment of students transferring into the district probably will tend to be resolved within the framework adopted for students theretofore residing within the district.

statement of the circumstances in which a transfer in such case may be granted or withheld are not such as to preclude the granting of a lateral transfer to a Negro who meets the requirements. Although the students now enrolled in the Dollarway District will probably be assigned for the 1960–61 school year to the same school they have been attending during the 1959–60 term, counsel for the Board advised the Court in the course of the argument that the Board prior to making its initial assignments for 1960–61 will publicize its assignment policies, and that any student who cares to request assignment to another school will have an opportunity to do so before the initial 1960–61 assignments are made.

The Court considers that the plan provides a start toward the elimination of racial discrimination, and that it is sufficient to initiate a transition period. The Board has repeatedly acknowledged its obligations under Brown, and the Court believes that the Board should have the opportunity to put its plan into operation so that it can be seen how it will work. If in the future any student or group of students feels aggrieved by Board action under the plan, this Court will be open after administrative remedies have been exhausted.

The foregoing assumes that the Board will act in good faith in the administration of its plan, and in this connection there are certain observations which the Court thinks ought to be made.

In the first place, when the situation at Dollarway is viewed realistically, it is clear that all applications for lateral transfers will probably come from Negroes, a situation which tends in itself to give a racial slant to the lateral transfer problem.

As indicated in the original opinion, the Board's policy against lateral transfers is tenable as an educational theory and is not in itself unconstitutional. On the other hand, it is obvious, and the Board's own experts have testified, that lateral transfers at the lower grade levels do not present the problems incident to such transfers at the higher levels. Such

being the case, the Board will not be justified in applying its transfer standards to the younger students as rigidly as it seems inclined to apply them to students in the more advanced grades. And should it do so, its action will constitute evidence that the general policy against lateral transfers has not been adopted in good faith and for valid educational reasons, but rather as a device to perpetuate segregation. It remains to be seen what the Board will actually do.

In the second place, while the Board's policy of making annual initial assignments of students previously enrolled to the same schools that they attended the year before can be justified by reference to the Board's policy against lateral transfers, the fact remains that the initial assignments so made will result in continued total segregation of the schools unless and until some degree of integration is achieved at the first grade level or unless and until the Board finds exceptional cases in the other grades justifying the granting of transfer requests.

The Board has stated with candor that in making assignments consideration will be given to race. As indicated, where a transition period has been initiated, limited consideration in assigning students may be given to race. However, if over a period of time substantial numbers of Negro students apply for admission to the first grade at the Dollarway School, and if substantial numbers of such students apply for transfers to that school at the lower grade levels, and if none of such applications are granted, or if the number granted is unreasonably low in proportion to the number of applications, the Court might find it hard to believe that unlawful and unreasonable racial discrimination is not being practiced.

In the last analysis, the future of the Board's application of the Pupil Assignment Law and of its own regulations and plan depends upon the good faith of the Board, and upon its willingness to recognize that it is not enough merely to start to put an end to racial discrimination in the schools. The transition from a discriminatory to a non-discriminatory

school system must not only be commenced, it must continue in good faith until racial discrimination has been eliminated.

An order will be entered approving the the report of the Board. Implicit in that order, however, will be the caveats and qualifications expressed in this memorandum.