Earnestine DOVE et al., Appellants,

v.

Lee PARHAM et al., Appellees
(two cases).

Lee PARHAM et al., Appellants,

v.

Earnestine DOVE et al., Appellees.
Nos. 16437, 16448, 16487.

United States Court of Appeals
Eighth Circuit.

Aug. 30, 1960.

Robert V. Light and Herschel H. Friday, Jr., Little Rock, Ark., for Parham, et al.

George Howard, Jr., Pine Bluff, Ark., and Robert L. Carter, New York City, for Dove and others.

Before JOHNSEN, Chief Judge, MAT-THES, Circuit Judge, and DELEHANT, District Judge.

JOHNSEN, Chief Judge.

These appeals are from orders made by the District Court, 181 F.Supp. 504 and 183 F.Supp. 389 in a transition by Dollarway School District No. 2, Jefferson County, Arkansas, from a segregated to a desegregated school system. Involved are the things which have occurred in the situation since our remand in Parham v. Dove, 8 Cir., 271 F.2d 132.

One of the directions in our mandate, 271 F.2d at page 135, was that an injunction should be entered against the District and its officers to prevent them from continuing to maintain, as against the student plaintiffs and the class represented by them, the system of unconstitutional segregation to which the District had been subjecting them in their educational process.

This direction was made because the school board had up to that time taken no steps, even of a transitional nature, to bring about the disestablishment of the existing unlawful status—which a recognition of the responsibility made clear by the Brown cases, Brown v. Board of Education etc., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, ought by then to have prompted.

We held, however, that, in view of the enactment of a state pupil placement or assignment statute, Act No. 461 of 1959, Ark.Stats. § 80–1525 et seq., the District would not be summarily required to make admission of the three individual plaintiffs involved to the school they sought to attend, but should be afforded the opportunity to make use of the provisions of the statute as a means or an aid in effecting an orderly location of pupils generally, in relation to the various factors which could be involved as to distribution in its school system, except those of purely racial consideration. 271 F.2d at page 137.

The recognition of facial validity which we thus gave to the statute was on the basis of it constituting a "legislative non-racial scheme", intended to serve in effecting student location through "over-all pattern", instead of by promiscuous result. Id., at page 138. But we cautioned that "the statute cannot * * * be made to serve through artificial application, as an instrument for maintaining * * * a system of racial segregation". Id., at page 136.

Judicial persuasion would not normally tend to be produced that a placement or assignment statute was being used as an auxiliary in effecting an orderly solution of a school district's integration problems, where the district had refrained from adopting any program to disestablish its previous racial discrimination, where the only application of the statute engaged in by it was to Negro students seeking to escape their segregated status, and where the only result brought about thereby was to leave the racial situation in the school system remaining exactly as before.

Standards of placement cannot be devised or given application to preserve an existing system of imposed segregation. Nor can educational principles and theories serve to justify such a result. These elements, like everything else, are subordinate to and may not prevent the vindication of constitutional rights. An individual cannot be deprived of the enjoyment of a constitutional right, because some governmental organ may believe that it is better for him and for others that he not have this particular enjoyment. The judgment as to that and the effects upon himself therefrom are matters for his own responsibility.

In summary, it is our view that the obligation of a school district to disestablish a system of imposed segregation, as the correcting of a constitutional violation, cannot be said to have been met by a process of applying placement standards, educational theories, or other criteria, which produce the result of leaving the previous racial situation existing, just as before. Such an absolute result affords no basis to contend that the

imposed segregation has been or is being eliminated. If placement standards, educational theories, or other criteria used have the effect in application of preserving a created status of constitutional violation, then they fail to constitute a sufficient remedy for dealing with the constitutional wrong.

Whatever may be the right of these things to dominate student location in a school system where the general status of constitutional violation does not exist, they do not have a supremacy to leave standing a situation of such violation, no matter what educational justification they may provide, or with what subjective good faith they may have been employed. As suggested above, in the remedying of the constitutional wrong, all this has a right to serve only in subordinancy or adjunctiveness to the task of getting rid of the imposed segregation situation.

That was the basis on which we held in our previous opinion, 271 F.2d at page 137, that the District was entitled to a use of the placement or assignment statute in relation to its desegregation task, when we stated that the statute was being accorded recognition "only as an implement or adjunctive element * * * for effecting an orderly solution to its (the District's) desegregation difficulties, in proper relationship to its other school-system problems, but with a subservience to the supreme-law declaration of the Brown cases as to all imposed segregation and the obligation owed to get rid thereof within the tolerance entitled to be allowed play under these decisions for accomplishing that result".

What has been said up to this point is foundational to our dealing with the questions presented by these appeals. Three appeals are before us. The first one, No. 16,437, involves a determination of whether the trial court was entitled to dismiss the complaint of the plaintiffs and deny them relief from the school board's refusal to admit them to the school they sought to attend. The second case, No. 16,448, is a cross-appeal by the District and the school board from the holding of the court that it had jurisdiction to deal with the complaint of the plaintiffs on its merits and was not required to make dismissal thereof on the basis that the plaintiffs had not exhausted their administrative remedies under the placement or assignment statute in respect to the board's action of denial against them. The third appeal, No. 16,487, is by the plaintiffs from the approval granted by the court to the transitional plan and program filed by the District after the other decisions here involved, in response to a requirement of the court that it submit "an affirmative statement of its plans and policies designed to bring about an end to compulsory racial segregation in (its) public schools".

## I.

■ It is, we think, quite generally recognized that a solution to the problem of effecting desegregation will in most instances have to come through a series of progressive, transitional steps. And the Brown decisions appear to permit of the handling of a situation in this manner, provided the school district engages in making a "reasonable start toward full compliance" and continues to move forward with "all deliberate speed".

The question here as to the propriety of the court's approval of the school board's plan and program for bringing about an end to the compulsory segregation existing in the District's school system thus is in its overall significance the most important one before us, and it will accordingly be first considered.

■ The approval order was made on the basis of the court's expressed view "that the plan provides a start toward the elimination of racial discrimination, and that it is sufficient to initiate a transition period". 183 F.Supp. at page 393. Our difficulty with this is that what the school board has said it intends to do does not seem to us to contain any demonstrable objectivity, of either effort or aim, so as realistically to be appraisable as a "reasonable start"—not in subjectivity, but in affirmative effort.

In substance, the plan states generally that the school board intends to use the provisions of the Arkansas pupil placement or assignment statute in respect to any application made for admission to a school, other than the one which the student is now attending. Application of the provisions of the statute will be made, the plan states, in relation to such policies as that "it is undesirable and unsound educationally to transfer a child from the school which he is presently in attendance (at) to a different school"; that "the Board should give favorable consideration to applications for the lateral transfer of students (that is, the transfer of a student from one school in the District to another school in the District) only in exceptional cases"; and that "When an exceptional case is found by the Board to exist, a lateral transfer may be granted if, in the opinion of the Board, the pupil can make the necessary adjustment and perform and achieve satisfactorily in the school to which transfer is requested."

The steeping of the provisions of the placement statute in such dissuading abstractions, where the board has never given any indication of an existing desegregation opening (such as an announced intention or undertaken action to admit some contemplated number of Negro students, by a designated time, at a particular level), does not afford much basis for it to say, or for a Negro realistically to believe, that the opportunity exists for such students, either in whole or part, to escape from their imposed segregation status. And the more is this .persuasion impelled as to the present situation, in that the only result which the District has demonstrated is subject to being produced by a use of the statute on the foregoing basis is to leave the segregation situation remaining, just as it is.

Relatedly, it may be noted that in its announced climate of principles for using the placement statute, the District has further made its processes of application of the statute consist in having applicants for transfer subjected to such devices as the California Mental Maturity Test, the Iowa Silent Reading Test, the Otis Quick Scoring Test of Mental Ability, the California Language Tests, the Bell Adjustment Inventory, and other such things— which, at least in the elementary area of public education, are new adornments upon the entrance doors to school houses and class rooms.

Again, in what the District has done and proposes to continue doing, application of these devices is not going to be made to the students generally of the system but only to such individuals as undertake to engage in application for a transfer—which in the realities of the District here simply means, to Negro students seeking to enter a white school.

The District admittedly has no intention to engage in any such general application of these devices as to enable it to effect a reconstruction or reorganization of its school system or its class rooms on the basis of the levels that might be arrived at from such individual scorings. Nor can it be said to intend to make the statute serve as a means for making a choice or selection among Negro students in relation to each other, for purposes of some initial, limited, transitional step in effecting the disestablishment of its segregation system—because the plan does not contain any definitive expression of indicated opening at any point for the admission, as suggested above, of some contemplated number of Negro students, by a particular time, at a designated grade-level.

The plan does engage in a use of some general softening language in respect to first-grade students, but it does not set forth any definitive program or step on the board's part for so effecting desegregation, or hold forth any promise of such a result, as a "reasonable start" at this level.

The board's statement says generally that "the educational considerations which make lateral transfers undesirable and unsound do not exist, for the most part, in the case of first graders"; that "they have not established relationships with teachers, formed extensive friend-

ships, become adjusted to a particular environment, established a curriculum pace, adopted a particular course of study, etc."; that "first graders do not have prejudices and fixed ideas concerning traditions to the extent that older students have"; and that "Therefore, the Board is not concerned 'with exceptional cases' in the sense involved in lateral transfers".

But to this there is added that "there must necessarily be a more extensive review of all facts relevant to the assignment criteria in making the initial assignment of first graders", and that the board "will make this more extensive review". And while it further is said in general terms that the opportunity will be given for pupils and their parents to make indication of school preference as to initial first-grade assignment, this is followed by the declaration that such assignments will be made "consistent with available school facilities, current teacher load, curriculum, emotional stability, readiness ability, adjustment potential and related matters."

Thus, the board has presented no objective plan for the admission of any Negro students to the first grade of its two white schools, as a step in the process of effecting desegregation in its educational system. It has not held out any indication of reasonable opportunity as a basis for such requests of initial assignment to be chosenly made. Nor has it stated that it is ready to make any such desegregating assignments. Instead, it in effect says that, before it can answer that question, it must, even as to first graders, delve into such things as "emotional stability, readiness ability, adjustment potential, and related matters".

The trial court, on careful consideration, was of the opinion that "The provisions for the initial assignment of first graders are fair on their face and are sufficient, if applied in good faith, to give at least some Negro children entering school for the first time in September of the current year (1960-1961) a reasonable chance of being assigned to the heretofore all-white Dollarway School."

183 F.Supp. at page 392. But, after a lapse of six years, we think a board should be required to come forth with something more objectively indicative as a program of aim and action than a speculative possibility wrapped in dissuasive qualifications.

What has been said above should be sufficient to indicate to the board its obligations to do more than to engage in generalities. Placement standards and educational doctrines are entitled to their proper play, but that play, as we have emphasized, is subordinate to the duty to move forward, by whatever means necessary, to correct the existing constitutional violation with "all deliberate speed".

We had intended to hold up the filing of this opinion until after the board had taken such action and produced such result as it intended to operate its school system under during the immediately pending school year. The press now contains a dispatch, indicating that the board has announced that it has assigned one 6-year-old Negro girl to the first grade in one of its two white schools for the pending year, and quoting the board as stating that it hoped that its action would help preserve the Arkansas pupil assignment law. We do no more than to note the item. The trial court may possibly desire to have indication made, in the more definitive expression of program which the board is being required to make, of what scope of opportunity generally was afforded for admission, in relation to such action.

Two further comments should perhaps here be made. Both we and the trial court have regarded the board as having been acting with subjective good faith. The question here, however, is not state of mind but required action. Required action is measurable only by objectivity.

The second relates to the statement of the trial court, 183 F.Supp. at page 393, as follows: "The Board has stated with candor that in making assignments consideration will be given to race. As indicated, where a transition period has been initiated, limited consideration in assigning students may be given to race".

■ Where a board has adopted a definitive plan of effecting desegregation by reasonable transitional steps, the racial question necessarily is geared to the scope of those steps. But only in that sense and within that need, we think, is there basis to say that consideration in assigning students may be given to race. The board may in such a situation find it necessary to make selection between Negro students, and it will be entitled to do so on proper judgment as to what will best serve to accomplish its program. However, as we have said above, it has no right to resolve or take action at any time on the basis that it is better for some individual not to have the enjoyment of his constitutional right.

## II.

As to appeal No. 16,437, relating to the court's refusal to order the three Negro plaintiffs admitted to the 12th and 9th grades respectively of the school they sought to attend, we think that the court was entitled to require in relation to the problem of general achievement, that the enjoyment of their right to desegregation be geared to a reasonable, definitive, transitional program of "all deliberate speed".

■ That problem, in its sound solution, is in most instances one for general, orderly, reasonable progression. Where the court concludes that a board is warranted in so proceeding, it does not have to leave the door subject to general crash efforts, on a "first come, first served" basis and consequence. This is not to say, of course, that such action may not be resorted to, where it appears to be necessary in order to break down the segregation barrier.

## III.

There remains for consideration No. 16,448, the appeal of the District and the school board from the court's refusal to dismiss the complaint for lack of jurisdiction to consider its merits.

■ The contention made is that the plaintiffs could not resort to the federal court against the action of the board in denying their applications for transfer, at least until after they had exhausted the remedies of appeal provided from such action to the State Circuit Court and State Supreme Court. The District and the board regard the appeals which are so provided for in the statute as part of the administrative process existing under the placement or assignment statute in respect to an application for transfer. Section 80-1531 of the Arkansas Statutes, as here pertinent, provides for a right of exception to the action of a school board in its assignment of a student, "as constituting a denial of any right of such minor guaranteed under the Constitution of the United States". If the board does not reconsider its action, "an appeal may be taken from the final action * * *, on such [constitutional] ground alone, to the Circuit Court * * * by filing * * * a petition stating the facts * * * bearing on the alleged denial of his rights under the United States Constitution * * *".

■ While the section further provides that "the Circuit Court will try the said cause de novo", it seems apparent, from the provision as to the scope of the exception to be made before the board and the requirement as to the contents of the petition ("the facts bearing on the alleged denial of his [constitutional] rights"), that the question which the court is intended to try is that of constitutional violation. Thus, the state remedy afforded is judicial and not administrative in its character and function. Judicial remedies of state courts for vindication of federal constitutional rights do not have to be exhausted, before there can be resort to a federal court, unless some federal statute so requires as to a particular legal situation. Lane v. Wilson, 307 U.S. 268, 274, 59 S.Ct. 872, 875, 83 L.Ed. 1281. See also City Bank Farmers' Trust Co. v. Schnader, 291 U.S. 24, 30, 54 S.Ct. 259, 78 L.Ed. 628; Carson v. Warlick, 4 Cir., 238 F.2d 724, 729.

## IV.

Cases Nos. 16,437 and 16,448 are affirmed. The order appealed from in case No. 16,487 is vacated, and the cause remanded for further proceedings.