Earnestine DOVE et al., Plaintiffs,

v.

Lee PARHAM et al., Defendants,
Charles Henry Dove et al., Interveners.

No. 3680.

United States District Court
E. D. Arkansas, W. D.

Aug. 25, 1961

George Howard, Jr., Pine Bluff, Ark., Robert Carter, New York City, for plaintiffs.

Herschel H. Friday, Jr., Robert V. Light, Little Rock, Ark., for defendants.

HENLEY, Chief Judge.

This litigation involving the elimination of compulsory racial segregation in the public schools of Dollarway Independent School District No. 2, Jefferson County, Arkansas, has now reached another stage.[1] On May 12, 1961, this Court having considered the reports of the Board of Directors of the defendant District, which reports are referred to in the margin, rendered an opinion and entered an order approving on its face the transitional plan of desegregation incorporated in those reports and authorizing the Dollarway School Board to proceed under said plan in making school assignments for the 1961–62 school year. The Board was directed, however, to report to the Court not later than July 15, 1961, as to the assignments actually made by it of Negro students who might manifest a desire to attend the formerly all-white Dollarway School. Dove v. Parham, D.C.E.D.Ark., 194 F.Supp. 112.

Following the entry of the order of May 12, 1961, the Board in due course made its assignments for the 1961–62 school year and, as directed, filed a report of its actions. The original plaintiffs herein have excepted to said report, and, in addition, five Negro pupils who applied for assignment to the formerly all-white Dollarway School have intervened herein as individual party plaintiffs. The cause is now before the Court upon the Board's report, the exceptions thereto, the intervention filed by the Negro students just mentioned, and the Board's response to said intervention. The principal question for determination is whether the Board's plan in operation can be approved as a permissible transitional plan calculated to end compulsory segregation in the defendant District within a reasonable time.

The plan to which facial approval was given in May 1961 may be summarized as follows:

The parents of all pre-school children, both white and Negro, about to enter school in the Dollarway District at the first grade level, were to be given an opportunity at a pre-school registration to indicate their preference as to which of the two schools in the District[2] they de-

---

1. On April 30, 1960, this Court approved a transitional desegregation plan submitted by the officials of the Dollarway District. Dove v. Parham, D.C.E.D. Ark., 183 F.Supp. 389, see also Dove v. Parham, D.C.E.D.Ark., 181 F.Supp. 504. The Court of Appeals held in part that the plan lacked specificity and objectivity, reversed that portion of the decision of this Court approving the plan, and remanded the case for further proceedings. Dove v. Parham, 8 Cir., 282 F.2d 256. The District was then directed to submit another plan, which was done. Said plan was incorporated in a report dated November 19, 1960, and supplemented by a report dated March 11, 1961.

2. The Dollarway Board of Directors administers also the Hardin school, a small elementary school situated in territory not contiguous to the remainder of the District. Hardin school is not involved in this litigation and the parties have proceeded in the main as though Hardin did not exist. Both schools in the District proper offer education in all 12 grades. Townsend Park School always has been and now is devoted to the education of Negro students exclusively. The Dollarway School, prior to the 1960–

sired their children to attend. Thereafter and before the opening of the school in September 1961 all of such children, regardless of race, were to be given standard aptitude tests, and all of such children scoring at least in the average range of such tests under nationally uniform grading were to be assigned, in general, to the school for which a preference had been expressed. That general assignment policy for prospective first graders was subject to the qualifications that the assignments would be consistent with available room and teaching capacity and would not be "clearly contrary to applicable and non-discriminatorily applied standards and criteria" contained in the Arkansas Pupil Assignment Law, Act 461 of 1959, and in the Board's regulations adopted pursuant to that statute.

As pointed out in earlier opinions, the Board has adopted a general policy against "lateral transfers" of students already in school from Townsend Park to Dollarway in other than "exceptional circumstances" defined by the Board. However, as part of its present plan the Board expressed an intention to enforce that policy with less rigor at the lower grade levels than at the higher.

The plan having been presented and argued pro and con, the Court, while pointing out certain objections to which the plan was subject,[3] gave the plan tentative approval, and authorized the Board to undertake to make 1961–62 assignments under it. While the Court was willing to give tentative approval to the plan as being valid and sufficient on its face as a transitional step, it was not willing to approve the plan finally in advance of seeing what actions the Board would in fact take under it. The Board was directed to report to the Court as to assignments actually made so that the Court would be "in a better position to judge whether the defendants have in fact and in good faith initiated a period of transition which will lead ultimately to the establishment of a non-discriminatory school system." 194 F.Supp. at page 116.

As to pre-school students who will enter the first grade in September, the Board reported that 158 of such students of both races were registered during late spring. Eighty-one of those students were white and were assigned automatically to the Dollarway School at which school they had been presented for registration.[4] Of the 77 Negro students who were registered, only two were presented at Dollarway, the remaining 75 being presented at Townsend Park. All 75 of the students presented at Townsend Park were automatically assigned to that school.

All of the children were administered the Metropolitan Readiness Tests and the California Test of Mental Maturity, Pre-primary. Of the 75 Negroes who had registered at Townsend Park, 22 scored average or better on the tests, but the two Negro children who had applied for admission to Dollarway made scores which were well below average.[5] On the

61 school year, always had been devoted to the education of white students exclusively. Before the commencement of the 1960–61 term three Negro students, two girls and a boy, applied for assignment to the first grade at Dollarway. One of the girls was so assigned. The other two applications were denied. The child who was admitted to Dollarway attended school there throughout the past term and was promoted to the second grade.

3. The Court's comments with respect to the plan are set out in full in the opinion of May 12, heretofore cited.

4. Under the plan the method whereby a preference was expressed for assignment of a prospective first grader to a particular school was the presentation of the child at the school of choice for registration. As expected, no white students applied for enrollment at Townsend Park.

5. There is nothing before the Court to suggest that the tests were improperly administered or that they were unfairly or improperly graded or evaluated. In its May 12 opinion the Court pointed out that the administration of such tests to students about to enter Arkansas public schools for the first time is neither novel nor unique educational procedure.

basis of the test results and upon impressions formed in the course of interviews with the children, the Board concluded that the educational program of the District and the educational needs of the two Negro children in question would be served best by assigning them to Townsend Park, which was done. A number of white students made lower scores on the tests than did the two Negro applicants for enrollment in the first grade at Dollarway, but since the tests were not used as assignment criteria for white students, the grades made by the white children just mentioned did not affect their assignment to Dollarway.

In accordance with the Board's regulations, all students who were enrolled in school during the 1960–61 school year and who did not graduate from high school were assigned for the 1961–62 term to the school which they had attended the preceding term.[6] Those initial assignments having been made, there were four applications for lateral transfers by Negro students at the lower grade levels. Two of such students applied for transfer at the second grade level, one at the third, and one at the fourth. One of those applications was granted, three were denied.

The application which was granted was that of a Negro boy who desired to transfer at the second grade level. In granting his request the Board took into consideration the fact that he was a good student, had done satisfactory work at Townsend Park, was well adjusted, neat, clean and industrious, and possessed certain qualities of leadership.

The other application for transfer at the second grade level was that of a Negro girl who had applied originally in 1960 for enrollment in Dollarway as a first grader. This applicant had failed to pass the first grade at Townsend Park and is to be retained in that grade. She was found to be somewhat of a problem from the standpoint of discipline and to be of rather low mentality. She was not

considered to have actually reached mental maturity requisite for enrollment in the first grade until the ninth month of the school term just passed.

The student who applied for transfer at the third grade level had done satisfactory work at Townsend Park in the first grade, but less than satisfactory work in the second grade, and was considered to be of average intelligence or less. The third grade student who applied for transfer at the fourth grade level is a shy person who needs constant encouragement and who did satisfactory to less than satisfactory work in the third grade.

In passing on the applications for lateral transfers the Board, in accordance with its established procedures, interviewed all of the applicants and their parents and considered all relevant material before it. As to the rejected applications, it was the judgment of the Board that the best interests of the applicants and the best interests of the overall program of the District required that the students involved be retained at Townsend Park.

### I.

■ Ruling appellate decisions, commencing with the Brown cases, establish that compulsory racial segregation in the public schools of a State is unconstitutional and must be eliminated either at once or over a period of transition. While this does not necessarily require the Dollarway Board affirmatively to assign Negro students to the Dollarway School, or even to invite such students to attend that school, it does mean that the Board, which has elected to proceed under a transitional plan, must make it possible within a reasonable time for any Negro student who desires to attend Dollarway, and who is otherwise qualified, to do so without regard to his race, and without being subjected to the application of assignment criteria and procedures which are not applied to white students. That is the ultimate result which the Board must achieve, and no

---

6. Thus, the Negro child who had attended Dollarway during the 1960–61 term was assigned to that school as a second grader for the 1961–62 term.

transitional plan can be approved unless it is designed to achieve and is capable of achieving that result.

Further, as this Court said in its opinion of February 19, 1960, Dove v. Parham, D.C.E.D.Ark., 181 F.Supp. 504, 514, 515:

"It should be emphasized * * * that the very concept of a transitional period implies a movement away from a school system characterized by compulsory segregation toward a system free therefrom. Once there is a demand on the part of interested students to attend nonsegregated schools, the burden is upon the local school board to initiate some plan or policy which, within the tolerance of Brown, will lead eventually to a racially nondiscriminatory school system."

In connection with a transitional plan assignment procedures and criteria such as are set up by the Arkansas statute and by the regulations of the Board can play a legitimate part in the assignment of Negro students to formerly all-white or predominantly white schools. But, such criteria cannot be employed constitutionally so as to hinder desegregation or so as to preserve a system of racial segregation. This has been made crystal clear by the Court of Appeals in this case, Dove v. Parham, supra, 282 F.2d 256, at pages 258–259.

## II.

The Board's plan in operation having been considered by the Court in the light of the principles heretofore stated and in the light of the teachings of earlier opinions of the Court of Appeals in this case, the Court is of the opinion that insufficient progress has been made to justify the Court in giving its full approval to the plan at this time as a permissible plan of transition.

Subject to certain modifications and qualifications, the Board's plan is essentially a "grade a year" plan, starting at the first grade, to be administered by application of the Arkansas Pupil Assignment Law to Negro applicants for assignment to Dollarway. In view of the Board's policy against lateral transfers, it is clear that the validity of the plan from a constitutional standpoint depends primarily upon its application at the first grade level. And it is at that level that the plan in action has failed with respect to 1961–62 to produce satisfactory progress.

The problem stems from the fact that there appears to be very little demand for integration among the Negro patrons of the Dollarway District, and consequently very few Negro applicants for assignment to the Dollarway School.

It is to be remembered that in its report of November 19, 1960, the Board proposed to admit to the first grade at Dollarway all Negro applicants who preferred to go there and whose assignments according to their preference were "not clearly contrary to applicable and non-discriminatorily applied standards and criteria" contained in the Pupil Assignment Law and in the Board's regulations adopted pursuant to that statute.

Mindful that the Court of Appeals has expressed concern with what it found to be a lack of demonstrable objectivity in an earlier and similar plan (282 F.2d at page 259), this Court required the Board to spell out more precisely the limits of the class of those deemed eligible for admission. Complying with that requirement, the Board then proposed to admit to the school of their choice all applicants who on certain readiness tests scored in the average range or higher and whose requested assignments were not clearly contrary to non-discriminatorily applied criteria of the Pupil Assignment Law and related regulations of the Board.

In giving the Board's supplemental plan tentative and facial approval the Court anticipated that there would be a substantial number of applications by Negroes for initial assignment to the Dollarway School at the first grade level, and that a substantial number of the applicants would be able to meet the objective intelligence and mental maturity standards prescribed by the Board, which standards are not in themselves unreasonable, as is indicated by the satisfactory scores made on the pre-school tests

by 22 of the Negro students who applied for enrollment at Townsend Park. As things developed, however, there were only two of such applications for enrollment at Dollarway and neither applicant was able to score within the average or better range of the pre-school tests.

Certainly, the Board cannot be blamed for the apparent lack of demand for desegregation in the District, or for the failure of the two applicants to score satisfactorily on the tests, or for adhering to its own objective criteria which it adopted at the urging of the Court. But, the fact remains that as the situation now appears the use by the Board of its objective intelligence and mental maturity criteria as an assignment standard at the first grade level, however well it might work in some other school district, is not going to produce at Dollarway anything other than token integration at scattered grade levels unless the number of Negro applications at the first grade level increases substantially and unless the intelligence of the applicants is substantially higher than that of the two children who applied this spring. That such token integration is not a sufficient compliance with Brown was held by the Court of Appeals in its latest decision in the Little Rock case. Norwood v. Tucker, 8 Cir., 287 F.2d 798, 809.

However, the Court is not prepared to say that the defect in the plan cannot be remedied, or that the Board cannot make a constitutional use of the Arkansas Pupil Assignment Law during a transitional period, provided that the Board is willing to realize that it must make additional progress along the road that it is required to travel, and that, in general, the fewer Negro applicants who present themselves at the first grade level, the narrower the permissible scope of certain pupil assignment criteria, and further provided that the Board in good faith continues to employ less rigor in the application of its policy against lateral transfers when requests for such transfers are made at the lower grade levels.

While, as stated, the Court deems the progress made by the Board with respect to 1961–62 to be insufficient, this does not mean that no progress has been made, and the Court is convinced that substantial progress in at least two respects is to be observed. Prior to the 1960–61 school year there were no Negroes in attendance at the Dollarway School. One child did attend that school during the year just mentioned, and two will be in attendance under the Board's plan during the coming year. More significantly, the criteria prescribed by the Board and the pre-school tests administered by it have established the existence of a class of Negro pre-school students which the Board would, in general, have been willing to assign to Dollarway had those students applied for such assignment, a class made up of about 30 per cent of the total number of Negro children applying for enrollment at the first grade level for the approaching school term. The establishment of that class is not only progress in itself, but public knowledge that it exists may well encourage additional applications from Negroes in future years, particularly if uncertainty and controversy over the District's desegregation problem can ever be put to rest.

In the Court's opinion the lack of satisfactory progress at the first grade level can be rectified by the Board's dispensing with "average or better" achievement on the pre-school tests as assignment criteria for Negro children applying for enrollment in the first grade at Dollarway except when the use of such an achievement standard is reasonably necessary to enable the Board to make an intelligent selection among a number of Negro children applying for such enrollment within a given year.

In applying assignment criteria during a period of transition it would appear that the officials of an affected district in fact may have wider latitude when the problem before them is one of *selection* out of a group of applicants of particular Negro students to be assigned to formerly segregated schools than when the problem is whether *any* Negro applicants are to be so assigned. See Dove v. Parham, supra, 282 F.2d at pages 260–262.

■ Where the number of applicants at any particular time is substantial, the school officials may properly employ assignment criteria so as to select out of the group the particular students most likely to succeed in their new environment and most likely to advance the district overall desegregation program. Such, in the Court's view, is for the best interests of the individual students themselves and is to the long-run advantage of their race and of the school system as a whole. On the other hand, where, as at Dollarway, the number of Negro applicants is extremely small, the problem of selection is different, if it exists at all, and the school officials must take care that they do not use assignment criteria, devised to meet problems of selection, as, in effect, an exclusionary device which, intentionally or unintentionally, preserves compulsory segregation.

When "average or better" achievement on the pre-school tests is eliminated as an assignment criterion, except when its use would be permissible as above indicated, prospective first grade students will be assigned in accordance with the choices expressed for them by their parents, unless assignment to the school of choice is inconsistent with available room and teaching capacity or is clearly contrary to other applicable and non-discriminatorily applied standards and criteria contained in the Pupil Assignment Law and the Board's regulations.

In the circumstances the Board should be given an opportunity to operate under its plan, subject to a qualification to be mentioned, during the approaching school year and to undertake to make assignments for the 1962–63 term, after which the situation can be considered further upon the application of any interested party.

### III.

■ There remain to be considered the individual applications for enrollment at Dollarway which were denied by the Board. In that connection the Court has given careful study to the findings and conclusions of the Board with regard to the respective applicants, which findings and conclusions were filed *in camera* and which will not be discussed in detail.

As to the applicants for lateral transfer at the second, third, and fourth grade levels, the Court is convinced that the Board's actions did not transcend permissible bounds in the application of the Board's general policy against lateral transfers, even the less rigorous application of that policy which the Board has said will prevail at the lower grade levels. The Court does not think the Board can be charged with unconstitutional discrimination against the individual applicants for lateral transfers whose applications were denied merely because it was considered inadvisable to transfer to a new school of faster curriculum pace students who were not doing too well in a school to which they were already acclimated and in which presumably they were adjusted. Aside from the constitutional context in which the question was presented, the actions of the Board in connection with those applications would appear entirely unexceptional.

■ The action taken with regard to the two first grade applicants presents a more serious problem. In the course of argument counsel for the Board indicated that in passing upon those applications the Board had considered both the test results and the interviews held by the Board members with the children and their families. And while counsel stated that the decisions reached were based principally upon the test results, he was unable to advise the Court whether either of the first grade applicants would have been admitted to Dollarway but for the test results. That inability is understandable because under its policy the Board did not consider either application apart from the tests.

Since the Court has decided that the requirements of "average or better" achievement on the tests as assignment criteria at the first grade level was objectionable in the circumstances existing with respect to 1961–62 assignments, the Board will be directed to reconsider the

two applications in the light of what has been said in this opinion and in the light of valid pupil assignment criteria other than the achievement requirement just mentioned, and to admit the two applicants to the Dollarway School, if they still desire to go there, when school opens, unless prior to the opening of school on September 5 the Board makes a satisfactory showing to the Court that such assignments would be clearly contrary to valid and non-discriminatorily applied criteria of the Arkansas statute and of the Board's rules and regulations.

An appropriate order will be entered.